242 S.W.2d 1 (1951)
STATE
v.
HINOJOSA.
No. 42151.
Supreme Court of Missouri, Division No. 2.
September 10, 1951.
*3 Jack G. Beamer, Robert A. Sniezek, William Icenogle and Stubbs, McKenzie & Williams, Kansas City, for appellant.
J. E. Taylor, Atty. Gen., John S. Phillips, Asst. Atty. Gen., for respondent.
LEEDY, Presiding Judge.
Victor M. Hinojosa (hereinafter called defendant) appeals from a judgment of the Circuit Court of Jackson County, convicting him of manslaughter by culpable negligence and sentencing him to imprisonment in the state penitentiary for a term of 10 years.
Among defendant's twenty-one separate assignments of error is one based on the refusal of the court to direct a verdict of not guilty. In determining the submissibility of a criminal case the state's evidence, with such inferences favorable to the state as may legitimately be drawn from the facts proved, is to be taken as true, and the evidence of defendant contradictory thereof is to be disregarded. State v. Moore, 339 Mo. 52, 60, 95 S.W.2d 1167, 1171. In the light of that rule, the facts may be thus stated:
Shirley Allen, a pedestrian, was struck by an automobile driven by defendant while she was on or near a safety island in a pedestrian lane at 39th and Broadway, in Kansas City, on the evening of December 3, 1948, at about 6 p. m. She died instantly as the result of a crushed skull, multiple contusions, abrasions and fractures. Broadway runs north and south, is 71 feet 4 inches in width from curb to curb, and has six marked lanes, three for northbound and three for southbound traffic. 39th Street runs east and west, is 46 feet 4 inches wide, and has a double set of streetcar tracks down the approximate middle. There are two pedestrian lanes across Broadway located, respectively, at the north and south lines of 39th. They are 12 feet wide and in each of them (at the center of Broadway) there is an elevated concrete safety island extending north and south. Traffic is controlled by automatic stop lights at each of the four corners of the intersection. The weather was fair and clear; the streets dry; street lights on; intersection well lighted. Miss Allen, with a companion, was walking across Broadway in the pedestrian lane on the south side of 39th when defendant, approaching from the north, and in violation of the red traffic signal light, drove his 1947 Oldsmobile coach into the intersection, in a southeasterly course, at a very high rate of speed, and collided with a car driven by Marion Stackhouse which had entered the intersection from the east (with the green light), and was making a left turn south onto Broadway. The collision occurred north of the center line of 39th. Defendant's car continued on its way approximately 28 feet until it ran over the safety island, struck Miss Allen, and dragged her, underneath the car, 40 or 50 feet to the southeast corner of the intersection where it ran into and through a large outdoor advertising signboard, and struck a brick building on the other side, and there came to rest. There were heavy and continuous skid marks extending from a point 4 or 5 feet southeast of the safety island back northwest for a distance of 87 feet along the course defendant's car had traveled. That defendant was at the time in an intoxicated and drunken condition was abundantly established by the testimony of a dozen of more witnesses, as will appear from these expressions which have been taken at random from the testimony: He could not walk without stumbling, and was obviously drunk; He got out of the car "very much glassy eyed," he was "out" or practically so; His face was flushed, clothing *4 disorderly, eyes bloodshot and bleary, strong odor of liquor, gait unsteady, definitely under the influence of liquor; He talked incoherently, face flushed, eyes bloodshot, odor of alcohol on him, and he could not answer questions; Said it was 3 o'clock when in fact it was near 7, face flushed, walked unsteady; Swayed and staggered when he walked; He was under the influence of alcohol and didn't know where he was, face very flushed, speech confused; He talked thick-tongued, as though his tongue was swollen; He was a little arrogant, very much intoxicated, noticed him weaving on the street; Defendant was drunk.
There was also evidence of defendant's erratic behavior just prior to the collision as he drove south in the heavy, home-going traffic along Broadway between Linwood Boulevard (32nd Street) and 39th. Miss Boutross testified that as she stopped for the red light at Linwood, a car which proved to be defendant's (and driven by him) bumped her slightly and in a few seconds later she "got hit very hard again," pushing her car across the pedestrian lane and out into the intersection. It was necessary for her to give a hard application of the brakes to keep from going into the cross traffic. She looked in the rear vision mirror and observed the man waving his hands; for what purpose she did not know. She testified that for the next three blocks (to Armour Boulevard) they "were more or less bumper-to-bumper at all times," defendant's car striking hers constantly, twice with such severity as to cause injuries to herself and to the other occupants of her car. Near 36th Street she "pulled over in the wrong (northbound traffic) lane to get away from him hitting me." After he had passed, she cut back into the inside lane again.
Richard J. Walters, a carpenter, was driving south on Broadway and at Armour he saw defendant's car bump and push a Pontiac which was directly ahead. In the vicinity of 36th Street the Pontiac pulled out of the way, but witness continued to watch defendant's car and thereafter saw it bump into a '38 Chevy, which likewise pulled out of the way. At the time witness started to stop at 38th Street, defendant was "running better than 60 miles an hour." He saw the accident from near 38th and Broadway.
James Harris, manager of the Brookside Garage, was proceeding south on Broadway (in the inside lane) and at the intersection of Valentine Road (between 36th and 37th Streets), defendant's car came up on his right side in such close proximity as to cause him to divert his car into the wrong or northbound lane to avert being sideswiped. He followed defendant's car to Broadway, and it was traveling at an estimated speed of 50 miles an hour, and "zigzagging in and out of traffic."
Arthur B. O'Keefe, a jewelry repairman, was driving a '38 Chevy south on Broadway between 36th and 37th when defendant pulled in behind and gave him a couple of bumps, then started pushing. Witness applied his brakes, turned off the ignition, and tried to turn out of that traffic lane, but defendant gave him another push, and he had to straighten up, and that put him back in the same lane as before. The car finally passed him "about 37th Street," at which time witness was traveling in the inside southbound lane, and defendant went around him by going out in the wrong or northbound lane. After pulling aside to "find out whether I had any brakes left," witness continued on to the 39th Street intersection, where he found defendant's car "in the billboard" at the southeast corner. Witness went over and said, "I believe you are the man that was pushing me, or had pushed me," and defendant's only reply was "My brakes; my brakes."
The driver of a taxicab which was proceeding west on 39th, testified that as he started across Broadway with the green light, he saw defendant's car approaching the intersection at high speed. Witness diverted his course, and turned north on Broadway to avoid being struck. Defendant's car was going 60 m. p. h., against the red light; defendant swerved to the southeast and hit the Stackhouse carthe back fender or somewhere in the back endwent over the abutment (safety island), and hit the girl and proceeded over and hit the signboard. Witness then went to *5 defendant's car. When defendant started the motor, witness said, "You better not do that." At that time others took defendant out of the car. Cars were waiting for the green light on Broadway when the collision occurred. The Stackhouse car was directly in front of the witness. When the light turned green, it proceeded west.
Wilbur Hurst was driving east on the north or inside lane on 39th and stopped at the Broadway intersection for the red light. When it turned green, he started up, but stopped for the Stackhouse car as the latter was making a left turn onto Broadway, and at that time he heard the sound of a racing automobile from the north. He immediately looked up, "spotted the headlights coming down," and "then backed up there slightly to give the road to him." Defendant's car came on, ran the red light and struck the Stackhouse car. Witness saw the young woman's body "slightly back of the front wheel" of defendant's automobile. Defendant was sitting in the car which was jammed into the billboard.
Howard Hughes, also traveling east on 39th, had stopped at the Broadway intersection and he was in the outside (or south) traffic lane, adjacent to the Hurst car. He heard brakes screech on defendant's car. This and the stopping of Hurst's car first attracted his attention. He further testified that defendant's car ran the red light, struck the Stackhouse car and kept going to his left until it ran over the curbing, and against the signboard. He saw two women at or near the safety island. They were "pretty near in the path of the car." The collision made quite a little dust. After defendant's car went by, there was only one woman left standing there. He went over to the car immediately, and saw deceased lying underneath the left front wheel.
Witness Dye, walking with the green light, had started east across Broadway in the pedestrian lane on the north side of 39th. He was accompanied by two companions, Dave Nicola and Harry Guthrie. He testified that when they had gotten out about 5 or 6 feet from the curb, they heard a car roaring, looked up and "saw a car [half a block away] come down the street and swerve right toward us. * * * We jumped back out of the road toward the curb." The tires were singing "like a turning car that is going around a curve at a fast rate of speed." The car continued on into the intersection, against the red light, swerving toward the south and east, at an estimated speed of 70 m. p. h. The collision with the Stackhouse car occurred, turning the Stackhouse car around, perhaps several times. He saw defendant's car go over the safety island, and hit a woman"She was hit and rolled up under the car and taken across the street under the left front fender."
Nicola was of the opinion they had gotten out about 10 feet into the intersection when he "heard the loud roar of a motor and the screaming of tires, which directed my attention to the north. I saw a car careening around, and I raced back for the curb." The car continued on into the intersection, against the red light "at a terrific rate of speed * * * around 60 miles an hour, maybe faster." He saw the car, then traveling in a southeasterly direction, collide with the Stackhouse car, causing the latter to "spin like a top." If he saw the women in the intersection, he did not recall it. The car "seemed to leap across the safety island, on across the other half of Broadway, up over the curbing and into a signboard, and stopped there abruptly." Witness, with Dye and Guthrie, then ran over to the car, and "asked Mr. Hinojosa where he thought he was going." Defendant replied, "Faulty brakes." This was the only answer witness could get from him.
Wm. Crosson was standing at the northeast corner of the intersection waiting for Dye, Nicola and Guthrie, when his attention was attracted to the car because of its excessive speed and the screaming of the tires. It was then about 100 feet north of the intersection. The car did not continue on in a straight line, but "he was cutting around the cars in the lane next to the north safety island." When he entered the intersection, the car was traveling 60 m. p. h. He saw the collision with the Stackhouse car, after which all he remembered "was the car coming over the *6 safety island. He hit these two ladies standing there, crossed the curb and into the signboard on the other side of the street."
After the car came to rest in the position mentioned, defendant nevertheless undertook to start it and back out. Nicola and Dye opened the car door and removed him for the reason, as one of them explained, they didn't want him to drive off. If he had moved the car backwards (and this was the only direction it could possibly have gone), it would have run over the girl's body. She was dead when removed from underneath the car a few minutes later. When told by one of the witnesses that he had killed a girl, he said "All right, I'll pay for it."
Defendant's car was subjected to an inspection by police at the scene, and the brakes were found to be in proper working order.
It may be added that defendant denied he was under the influence of intoxicating liquor, although he admitted having had four Scotch and seltzers between 2:30 and 5:30 p. m. (two just before lunch at 2:30 at a restaurant at 36th and Broadway, and two at the Union Station between 3:45 and 5:30). His version was that he approached the intersection at 25 to 30 m. p. h., and that the Stackhouse car entered the intersection just as he (defendant) approached it, with the green light in his favor; that he applied his brakes and attempted to swerve to the left, but was unable to avoid hitting the Stackhouse car, and that he lost control of his car and it was deflected off to the left and into Miss Allen as she stood on or near a safety island in the middle of Broadway, and from there to the billboard on the east side of Broadway, where it came to a stop.
We utterly fail to appreciate how it can be thought that the facts disclosed by the state's proof failed to make a submissible case, and required a directed verdict of not guilty. If found and believed by the jury (as they were), such facts were not only sufficient to warrant, but would compel a finding that the negligent conduct here involved was of such a reckless character as to indicate an utter indifference for human life, and hence culpable within the meaning of § 4382, R.S. '39 and Mo.R. S.A., § 559.070, RSMo1949. State v. Ruffin, 344 Mo. 301, 126 S.W.2d 218; State v. Sawyers, 336 Mo. 644, 80 S.W.2d 164; State v. Schneiders, 345 Mo. 899, 137 S.W.2d 439; State v. Adams, 359 Mo. 845, 224 S.W.2d 54. The proposition need not be further developed. The court did not err in failing to direct a verdict of acquittal.
Defendant urges that the case was improperly transferred to the division in which the trial was held. This claim is based upon supposed violations of certain local rules of practice formulated by the Jackson County Circuit Court. The point is not determinable on this appeal because such rules neither appear in the record, nor are they a matter of which an appellate court takes judicial notice. State ex rel. Clinton Const. Co. v. Johnson, Mo.Sup., 272 S.W. 928.
Defendant's "Motion to require the production of documents for inspection" was sustained as to photographs of defendant's car and all other vehicles in connection with the occurrence in question, together with photographs of the streets and skid marks and marks appearing on the safety zones or sidewalks, and marks appearing on the buildings or signboards, and photographs of the defendant, all made December 3, 1948. The court's order permitted inspection and photocopying of these photographs. The motion was overruled in respect to diagrams of the scene, notes taken and compiled by investigating police officers relating to conditions at the scene, notes and recordings of statements made by defendant, etc. The single case relied on in support of the assignment that the court erred in overruling the motion in part is State v. Naething, 318 Mo. 531, 300 S.W. 829, where the defendant was charged with possession of intoxicating liquors. It was there held to be error to deny his motion to examine, inspect and take for analysis samples of the contents of containers said to contain intoxicating liquor which were found in his home and seized under a search warrant. But here there was no showing of relevancy or materiality. The *7 court would have had no authority to order the production of irrelevant and immaterial matter not admissible in evidence, and this is true even though such matters might aid in the preparation for trial. State ex rel. Thompson v. Harris, 355 Mo. 176, 195 S. W.2d 645, 166 A.L.R. 1425. Such was the holding of the court en banc with reference to a statement made by a plaintiff in a damage suit to defendant's claim agent which plaintiff sought to have produced prior to trial. See, also, State ex rel. Page v. Terte, 324 Mo. 925, 25 S.W.2d 459, and State ex rel. Bostelmann v. Aronson, Mo.Sup., 235 S.W.2d 384.
Defendant's first attack upon the information came in his motion for new trial. He expressly concedes that it is in the form approved in State v. Renfro, Mo.Sup., 279 S.W. 702; State v. Scheufler, Mo.Sup., 285 S.W. 419, and State v. Murphy, 324 Mo. 183, 23 S.W.2d 136, but he complains of those cases as being inconsistent with later declarations of this court to the effect that a defendant cannot be convicted of manslaughter by culpable negligence by the application of res ipsa loquitur, stated in State v. Adams, 359 Mo. 845, 851, 224 S.W.2d 54, 57, following State v. Simler, 350 Mo. 646, 654, 167 S.W.2d 376, 382. The contention is untenable, as an examination of the allegations of the information in the form appearing in the cases first mentioned will show.
A much more serious question is raised by the assignment complaining of the failure of the court to sustain defendant's challenge for cause to a prospective juror, Mrs. Mary K. Milligan. Defendant's objection was on the ground that Mrs. Milligan's husband was the then president of the board of police commissioners of Kansas City (an admitted fact), and that the "prosecution depends almost entirely on the police witnesses." From her very brief voir dire examination it appeared that her husband was not connected with the department at the time of the fatality, and that he had only recently before the trial become so connected; that he had never discussed the case with her; that she was out of the city at the time it happened and "knew very little about it." She stated that she had "no possible prejudice" in the case, nor any opinion concerning it, and that she "could sit with a free mind in the matter, hear the evidence and instructions of the court, and fairly and impartially render a verdict." The state's position was then, and is now, that the prosecution did not depend entirely on police witnesses, and that the prospective juror's examination failed to show any disqualification on her part. It would, perhaps, have been more prudent (and the safer course) for the trial court to have sustained the challenge, and thus eliminated the possibility of error in this regard; but we are not prepared to hold, under the facts here involved, that the court committed error in failing so to do.
In support of the validity of the challenge, we are cited to the case of State v. Butts, 349 Mo. 213, 159 S.W.2d 790, 793, 140 A.L.R. 1177. It was there held a member of the police department was not a qualified juror in a case where it appeared that other members of the same police department and the chief thereof (the prospective juror's superior) were material witnesses. It was there said: "The primary duty of a police officer is to preserve peace. He is an officer of the law whose duties require him to come in daily contact with crime and law enforcement. He is paid out of the public treasury to devote his time to his duties. There are certainly thousands of good citizens aside from the police force in Jackson county and a sufficient number in any county of the state who can qualify for jury service. It ought not be necessary to withdraw police officers from the performance of their duties to fill a jury panel. It is bad practice to do so for the trial of civil cases, and a police officer should in no case serve as a juror in a criminal case." This is as far as the court has gone. We have found no cases involving the spouse or other relative of a police officer. We do not regard the Butts case as controlling. Here the prospective juror was not related to, nor for aught that appears, acquainted with any of the witnesses. We have long since gotten away from the common law principle of a union of person in husband and wife, so *8 that the point at which the relationship of spouse is to be regarded as a ground of disqualification in a situation of this kind is something addressed to the sound discretion of the trial court. Nothing is better settled than that trial courts have wide discretion in determining the qualification of jurors. State v. Brown, 360 Mo. 104, 227 S.W.2d 646. We find no abuse of that discretion here presented.
A reading of the complete voir dire examination of Grady F. Keys, a bus operator for Kansas City Public Service Company, convinces us, as it did the trial court, that his use of the word "prejudice" in describing his state of mind as a prospective juror was loose and inaccurate; and, in fact, what he meant was that from newspaper accounts he had formed an opinion. However, it plainly appears that he stated he could and would, if selected as a juror, sit and hear the evidence and the instructions of the court, and decide the case solely and alone upon that, and "throw away any impression" he might have had from reading the newspaper. Upon this basis, defendant's challenge for cause was overruled, and, we hold, properly so in the light of the court's discretionary powers, as pointed out in reference to Mrs. Milligan.
We do not discuss the assignment that the court erred in admitting State's exhibits 8-12, both inclusive, being photographs of different portions of the intersection, because the objections now urged were not interposed at the trial, and hence not preserved for review. Similar treatment must be accorded the assignment going to the opinion of certain of the state's witnesses as to the rate of speed at which defendant was traveling as he approached and entered the intersection, because no objection was made at the trial.
There is no substance in the claim that the court erred in permitting one of the state's witnesses (a member of the Traffic and Safety Bureau of the Police Department) to refresh his recollection as to distances shown on a plat of the intersection prepared by him, and drawn to scale. That the plat was one of the documents defendant had sought unsuccessfully to have produced for his inspection (which was the ground of the objection) did not render it unavailable to the state for the purpose mentioned.
It is claimed error was committed in permitting three of the state's witnesses to testify that in their opinion defendant was intoxicated. In the motion for new trial this complaint was made with respect to all fourteen such witnesses. The ground relied on is that "the proper foundation, that is, the facts upon which such opinions were based, was not laid." The record has been examined, and found to show that these witnesses had been sufficiently qualified by showing the facts and circumstances upon which such opinions were based. Limitations of space forbid our setting out such portions of the transcript.
Defendant's admissions made to police officers, both at the scene and at police headquarters, were shown to have been voluntarily made, and were admissible under State v. Pippin, 357 Mo. 456, 209 S. W.2d 132. We are asked to re-examine that case in the light of certain objections to the admissions which are raised for the first time on this appeal. These will not be noticed. Being satisfied with the soundness of the Pippin decision, we adhere to the conclusions there reached.
We need not determine the merits of the point that Dr. Giesler (a resident physician at General Hospital, who was summoned by the police) should not have been permitted to state his opinion "that the man was intoxicated" when he examined defendant at police headquarters and at the hospital shortly following the accident. It is charged that the physician's information was obtained while attending defendant as a patient, and, therefore, privileged; and because defendant did not consent to any examination and he was, in effect, being forced to testify against himself. The offending opinion was merely cumulative upon an issue which was so thoroughly and overwhelmingly established by other testimony as to make it certain that no prejudice could possibly have resulted to defendant, even if this segment *9 of the proof could be regarded as having been erroneously admitted.
We place in juxtaposition the assailed portion of state's instruction No. 2 and the form from which it was adopted, the latter appearing as state's No. 4 in State v. Studebaker, 334 Mo. 471, 477, 66 S.W.2d 877, 879:

 No. 2 Studebaker
"Culpable negligence, within the "The court instructs the jury that
meaning of the law, is the omission culpable negligence is the omission on
on the part of a person to do some the part of one person to do some act
act, under given circumstances, which under given circumstances which an
an ordinarily careful and prudent ordinarily careful and prudent person
person would do under like circumstances, would do under like circumstances,
or the commission of some showing on the part of such person
act, under given circumstances, which a careless or reckless disregard
an ordinarily careful and prudent person, for human life or limb, or the doing
under like circumstances, would of some act under given circumstances
not do, such omission or action showing which an ordinarily careful and
on the part of such person a reckless prudent person under like circumstances
disregard for human life or limb, would not do, showing on the
by reason of which omission or action part of such person a careless or
another person is directly endangered reckless disregard for human life or
in life of bodily safety." limb, by reason of which omission or
 action another person is directly endangered
 in life or bodily safety."

It is charged that the instruction was confusing, misleading, ambiguous and susceptible of erroneous interpretation. The argument in this connection is this: "The words used in the two instructions are almost identical, but their over-all meanings are quite different. Whereas the instruction in the Studebaker case advises the jury that some acts of ordinary negligence may be culpable negligence, if they indicate or evince a reckless disregard for human life, the instruction in the case now before the court, on the other hand, advises the jury that the doing or not doing of some act which an ordinarily prudent man would or would not do under like circumstances in itself indicates a reckless disregard for human life and limb and constitutes culpable negligence. In other words the phrase appearing in the Studebaker case `showing on the part of such person a careless and reckless disregard for human life or limb,' is a limitation and qualification of the preceding phrase defining ordinary negligence. In the case now before the court, however, the phrase `such omission or action showing on the part of such person a reckless disregard for human life or limb,' in no way qualifies or limits the preceding clause defining ordinary negligence, but to the contrary, advises the jury that they may infer a reckless disregard for human life or limb from acts of ordinary negligence, and thereby find the defendant guilty of culpable negligence and manslaughter."
This criticism of the instruction is hypercritical and without substance. It obviously misinterprets and confuses the plain meaning of both instructions, the language of which has been purposely set forth to readily and effectively demonstrate that, contrary to defendant's contention, there is no difference in their meaning and effect. The second paragraph of No. 2 consists of a rescript of defendant's instruction No. 11 in the Studebaker case, and, speaking of the combination of these, the opinion in that case says that "defendant got all he was entitled to, if not more * * *."
State's instruction No. 3 is assailed as having failed to hypothesize specific facts, such as defendant's speed, sobriety, etc., as shown by the evidence. It is in conventional and approved form, State v. Winkler, 309 Mo. 28, 35, 273 S.W. 1040, *10 1042, and cases there cited, and is not to be condemned because differing from the type of submission prevailing in tort cases under our civil practice.
Instruction No. 4 told the jury that if "the defendant was exercising ordinary care at the time of the incident referred to in the evidence and could not have avoided the accident by the exercise of such care," then the jury should find him not guilty, to which was also appended a definition of "ordinary care" in conventional form. There is nothing to justify the complaint that the use of the word "accident" would have confused the jury and authorized them to find the defendant guilty "if for any reason, whether based on facts introduced in evidence or not, they believed the defendant was not acting as an ordinarily prudent and careful person." It is also urged that the necessary converse of the proposition submitted by the instruction is that if the defendant was not exercising ordinary care at the time, he should be found guilty, regardless of whether the failure to use proper care evinced a reckless disregard of life. We do not agree. That which was necessary to authorize a verdict of guilty was expressly set forth, explained and made abundantly clear in the other instructions, and a verdict of guilty was not therein authorized upon a finding of mere failure to exercise ordinary care. The instructions must be read as a whole.
We consider together the assignment complaining of the action of the court in orally withdrawing instruction "D" on the subject of accident, and that complaining of the failure of the court to instruct on that subject. It appears that after giving "D", the court withdrew the same (prior to the arguments) by orally informing the jury to that effect, and saying that "the jury will entirely disregard that instruction, and anything I read from it." Defendant contends that this was itself an instruction upon a question of law arising in the case, and hence, under § 4070, R.S. '39 and Mo. R.S.A., § 546.070(4), RSMo1949, required to have been given in writing. We are cited to no cases, nor do we know of any, holding that the withdrawal of an instruction must be in writing. The single case cited, State v. Colson, 325 Mo. 510, 30 S. W.2d 59, is not in point. It did not involve the withdrawal of instructions, but instead, exhibits (which had been improperly received in evidence), and in connection with the withdrawal of such exhibits the court read to the jury a statute relative to the duties of an officer of the kind there on trial. This was held to be improper, but the case was nevertheless affirmed, the error being deemed harmless under the circumstances.
Passing now to the merits of defendant's contention with respect to instructing on the law of accidental homicide, it is to be borne in mind that "under the necessary implications of Sec. 4380(1) [R.S. '39 and Mo.R.S.A., now § 559.050, RSMo1949] an accidental killing is not excusable if the homicide was committed * * * through culpable negligence." State v. Aitkens, 352 Mo. 746, 761, 179 S. W.2d 84, 93. It appears that, except for the omission of defendant's instruction "B" to literally say or use the word "accident" or "accidental," it constitutes a direct submission of that hypothesis. That instruction, which is based on defendant's own testimony, hypothesizes the following facts: That defendant was driving in a southerly direction on Broadway at the time and place in question; that as his car "entered or was about to enter said intersection" the Stackhouse car was driven westerly "into said intersection and directly into the path" of defendant's car; that "defendant swerved the automobile so operated by him in an effort to avoid said Stackhouse automobile and in so doing defendant's said automobile collided therewith and thereby was deflected from its course and thereby was caused to collide with Shirley Allen." It then directed the jury that if they further found "that defendant's automobile would not have collided with Shirley Allen, except for the presence of said automobile in the intersection, and that the collision between defendant's automobile and said deceased was not caused by or due to culpable negligence of the defendant * * *, then you shall find the defendant not guilty."
*11 The instruction, while not expressly defining "accident," does epitomize defendant's version, and in practical effect, and in a way which the jury would readily understand, submits his theory of accidental homicide, and this is all he is entitled to.
The court refused defendant's instruction "E", which defined "proximately caused," and told the jury to find defendant not guilty unless they "shall believe and find from the evidence beyond a reasonable doubt that the death of Shirley Allen, deceased, was proximately caused by the culpable negligence, if any, of defendant, as defined in other instructions." The given instructions made it clear that in order to convict it was necessary to find that defendant's culpable negligence caused the death of deceased, so that the matter sought to be submitted by "E" was sufficiently covered by the other instructions, and there was no error in its refusal.
The refusal of a proffered cautionary instruction ("F") is also assigned as error. It advised the jury that it was the duty of the court to instruct them as to the law in the case, and that it was their duty to respect the instructions as such, and to find a verdict according to the law as thus declared and the evidence; that they had no right to permit their feelings of sympathy to interfere with their duty, nor to allow any consideration of public policy or overanxiety to enforce the law to influence them in the fair consideration and decision of the case. The giving of cautionary instructions is discretionary with the court, and no abuse of such discretion is here shown.
Defendant makes two assignments concerning the closing argument of the prosecutor, but inasmuch as his motion for a new trial makes no complaint of the first of these, the matter is not open to review. The other complains of the failure of the court to instruct the jury to "disregard prejudicial and inflammatory remarks made by the state during closing arguments." This has to do with what transpired in the closing seconds of the prosecutor's argument. The record is confusing, and leaves us in as much doubt and uncertainty as it probably did the trial court as to the particular matter defendant's counsel sought to have the jury instructed to disregard. The court had sustained the objection shown by the marginal note,[1] but this was not followed by a motion to declare a mistrial, nor any re-request that the jury be instructed to disregard the offending argument. But the prosecutor continued on to the extent of about four sentences (in finally concluding), and he was then interrupted by defendant's counsel making the request which gives rise to the present point, as appears from the following:
"Mr. Fox: Many heartaches have come to Mr. and Mrs. Allen since their child was killed. She was 20 years of age. Shirley isn't here and she can't come here
"Mr. Williams (interrupting): Your Honor, I make the request that the Court instruct the jury to disregard Mr. Fox's argument
"Mr. Fox (interrupting): Thank you.
"Mr. Williams:it is improper and doesn't prove or disprove any issue.
"The Court: I won't pass on that."
It was apparently not the reference to Shirley Allen's absence to which the objection shown in the marginal note was directed. If it had been, the objection would certainly have come earlier. It appears that what was there objected to was the prosecutor's exhortation in attempting to bring the situation home to the jurors individually, *12 by the reminder that "it might have been your child * * * or mine." Unless the request to instruct to disregard relates back to the argument as to which the court had already sustained an objection, there is nothing before us for review, because it is the latter which is set out in the motion for new trial and made the basis of the complaint now urged. It does seem that if counsel had not been satisfied with the mere sustention of his objection, he would have promptly, and without waiting until after the prosecutor had resumed, moved to have the jury directed to disregard the offending argument, the identification of which could not then have been in doubt. But this was not done. To request (at the particular juncture the record shows it to have been made) "that the court instruct the jury to disregard Mr. Fox's argument * * * [as] improper and doesn't prove or disprove any issue" would seem to imply that the motion, if not actually extending to the whole of the prosecutor's argument, was directed to a feature other than the portion to which the objection had been previously sustained, and, as we have pointed out, only the latter is preserved by the motion for new trial. But even if we are in error in our construction of the record, the incident cannot, in any event, be regarded as of sufficient importance to warrant a reversal.
Lastly it is assigned that the punishment is excessive, and the basis of that claim is that "there is evidence of passion and prejudice against the defendant contained in the whole transcript." We are not referred to any specific place or places in the transcript where such may be found. Indeed, the only reference to the transcript under this assignment is this: "On voir dire examination there is evidence by prospective jurors of reading reports and accounts in the local newspaper concerning this case." This fact alone is not sufficient to show passion and prejudice, nor, indeed, would it even furnish a legitimate ground of challenge against a prospective juror. The other facts urged in support of the claim are de hors the record, and, of course, may not be considered in passing on the point. It is true the penalty assessed is the maximum permissible under the statute, but it is also true that the offense was of a most grievous and aggravated nature. That the jury, under the facts outlined, and in the exercise of its discretion, saw fit to impose the maximum is not to be regarded as indicating bias and prejudice on its part.
Defendant had a fair trial, and our review of his conviction, upon comprehensive briefs and able oral arguments, fails to disclose reversible error. The judgment should be, and it is, affirmed.
All concur.
NOTES
[1] "Mr. Fox: * * * Now we can't bring Shirley Allen back. She can't be here today, but this is Shirley Allen's day in the courthouse. It is true she isn't here. What are you going to say to her, ladies and gentlemen? What are you going to say about this terrible thing? Are you going to permit a man to run through that light and kill innocent people, in his condition? Are you going to do that? I am sure you are not. I want you to tell Mr. Hinojosa, `You can't do that.' You ladies and gentlemen who have children should think that it might have been your child, it might have been your child, or it might have been mine.

"Mr. Williams: That is objected to as improper and prejudicial, that line of argument.
"The Court: Objection sustained. Your time is up."