262 S.W.2d 5 (1953)
STATE
v.
CAMPBELL.
No. 43575.
Supreme Court of Missouri. Division No. 1.
November 9, 1953.
Tom A. Shockley, Waynesville, for appellant.
*6 John M. Dalton, Atty. Gen., Grover C. Huston, Asst. Atty. Gen., for respondent.
LOZIER, Commissioner.
Defendant has appealed from his conviction and two year sentence for grand larceny but has filed no brief. "We, therefore, review the record proper and all valid assignments of error in the motion for new trial." State v. Jonas, Mo.Sup., 260 S.W.2d 3, 4[1].
Defendant's new trial motion contained ten assignments of error. Five challenged the sufficiency of the evidence to sustain the conviction and alleged error in the trial court's refusal to direct an acquittal. Four assignments related to an alleged unlawful arrest, an alleged unlawful search and seizure and the admission of evidence obtained under a search warrant. In the other assignment, defendant claimed that certain evidence was erroneously admitted. However, as he did not object to the admission of that evidence, the alleged error was not preserved for review. State v. Hinojosa, Mo.Sup., 242 S.W.2d 1, 8[11].
The following summary of the state's evidence at the trial on the merits (defendant offered none) and defendant's evidence on the motion to suppress (the state offered none) shows that the trial court did not err either in holding that the evidence was sufficient to support the verdict or in overruling the motion to suppress. At the trial, the state's evidence was: About 9 p. m., April 7, 1952, James Groover watched three men remove gasoline from a drum at his sawmill and pour it into the tank of a green 1931 Chevrolet car. He recognized Earl Ray and Raymond Ray. He did not know the third man, the driver of the car, but observed that he was a "kinda' tall, slim man." The three then got into the car, turned on its lights, drove a short distance to Groover's truck and turned off the lights. Groover heard a car door slam, heard someone walk on the truck bed, heard another car door slam, saw the car lights go on and saw the car drive off.
Junior Hunt saw defendant and the Rays in the vicinity of the sawmill around 5:30-6 o'clock that day and helped them fix a flat tire on defendant's green 1931 Chevrolet car.
The next morning, April 8, Groover discovered that a truck wheel rim, tire and tube (which Groover had placed on the bed of the truck parked at the sawmill about 7 p. m. the previous evening) and about 10 gallons of gasoline had been stolen. The total value of the property was $52. Groover reported the theft the same morning to Trooper Hoevelmann of the state highway patrol and gave him a description of the tire, viz.: A. B. F. Goodrich 8.25 x 20, 10-ply, with one edge "worn off all round, * * * one little ring on the outside" (due, Groover said, to use on a wheel with a broken spindle bolt). Groover described the rim as having a particular tap welded thereon. Groover described the car used by the thieves, named the Rays and described the third thief as "tall, slender, and the one that got in the driver's side of the car."
Trooper Hoevelmann testified that he knew defendant and, from Groover's description of the third man and of the car, he suspected that defendant was the third thief; that he went to the sawmill and saw tire tracks made by tires of the same size as those on 1931 Chevrolets; that he "contacted all the places that would buy or sell used truck tires * * * and advised them to notify me if anyone came in there and I gave them the names of the suspects and the description of the car"; that, when he went off duty about 4 p. m., April 8, he "gave Trooper Stone the information to be on the lookout for this car, with Earnie Campbell and the two Ray boys."
Trooper Stone testified that he observed a green 1931 Chevrolet at Wilson's Auto Salvage on U. S. Highway 66, about 5 or 5:30 p. m. that same day, April 8; that he turned around and saw the car had been moved across the highway to Moreland's Truck Stop; that he knew defendant and Earl Ray; that defendant was driving and *7 Earl Ray was with him. Stone telephoned Hoevelmann. Stone followed defendant's car, which "pulled over, apparently to let me pass and slowed down. Well, I put the red light on the car and it stopped, and Earnie Campbell came back (about 15' or 20') and asked me what I wanted. * * * I told him to `go back up to his car.' And I went up there and told Ray to get out of the car and about that time Trooper Hoevelmann drove up, and he arrested Campbell and Ray for investigation of grand larceny." As Stone walked by defendant's car he observed the tire and rim on the back floor board leaning against the back of, and protruding above the top of, the front seat.
Trooper Hoevelmann testified that he had no warrant for the arrest of either defendant or Ray, told them that "they were both under arrest for investigation," and saw the tire and wheel in defendant's car as he went to its rear to check the license number. Neither trooper opened the car door to look at the tire"it was a small car and a big truck tire, you couldn't hide it; it set up there."
After the arrest, defendant drove Hoevelmann in defendant's car, and Stone drove Ray in Stone's car, to the patrol station. En route, according to Hoevelmann, he said nothing about the tire, and told defendant only that he was arrested for investigation; "and he (defendant) came out voluntarily and said `he was bringing this tire out to the patrol headquarters,' and I said, `What tire?' He said, `the tire in the back.' I said, `Where did you find it?' He said he found it east of Wilson's and was going to turn it into our office."
Arrived at the patrol station, defendant parked his car on the patrol lot. Hoevelmann "got out on the opposite side of the driver and he (defendant) got out and handed the (car) keys to me and said, `I guess you want these.' I said, `Yes sir.' And I asked him `whether he could lock the car' and he said, `No.' * * * I could see the glass was broken." At the station, both defendant and Ray were "processed" and their personal belongings, including defendant's car keys, were placed in separate sealed envelopes. Defendant and Ray were then taken to Rolla and confined in the county jail.
The next morning, April 9, Groover went to the patrol lot and saw the tire and rim in the back of defendant's car. Groover did not open the car door but identified his property by looking through the window. Upon Groover's application, the Phelps County magistrate issued a warrant for the search of defendant's car and the seizure of the tire, tube and rim. That afternoon, April 9, the Phelps County sheriff, accompanied by Groover, went to the patrol lot, opened the unlocked car door and removed the tire, tube and rim. At the trial (over defendant's objection, for the same reasons he assigned in his motion to suppress this evidence) the tire, tube and rim were identified by Groover as the property stolen at the sawmill on April 7, 1952, and were admitted in evidence.
As stated, defendant offered no evidence at the trial. At the close of the state's case, he moved for a directed verdict of acquittal "for the reason that the only evidence herein that tends to connect the defendant with the theft of the property mentioned in evidence was obtained by means of an unlawful arrest and illegal search and seizure of defendant and the automobile in which he was riding."
Prior to trial, defendant had filed, and the trial court had overruled, a motion to suppress the evidence obtained under the search warrantthe tire, tube and rim. See Supreme Court Rule 33.03. In support of his motion, defendant called the magistrate, Troopers Hoevelmann and Stone and the prosecuting witness, Groover. The testimony of each of these witnesses was substantially the same as his testimony at the subsequent trial. (In addition, Stone testified that a garage operator told him that defendant and Earl Ray had tried to sell him the tire, tube and rim on April 8.) Defendant then took the stand. His version was that, when he and Hoevelmann arrived at the patrol lot, Hoevelmann "told *8 me to give him the (car) keys, he wanted to lock it (defendant's car) up to keep the thieves out of it"; that he (defendant) gave Hoevelmann the keys. "Q. Did he offer to give you an opportunity to move your car that night or take it anywhere? A. No, he didn't. Q. And the car was left out there the last time you saw it? A. Yes." Defendant denied that, at the time of the arrest, Hoevelmann told him what he was arrested for, and denied that, en route to the station, there was any conversation about the tire; that, arrived at the station, he parked the car on the patrol lot and "handed him (Hoevelmann) the keys after he asked for them. * * * He said, "Give me the keys. I want to lock it up to keep the thieves out of it.'"
Upon cross-examination of defendant:
"Q. Did you ask for an opportunity to call anyone at that time? A. No, I didn't.
"Q. You didn't ask any one at the patrol station to call anyone? A. No.
"Q. Have you ever left your car there at the parking lot of the patrol station before? A. Yes.
"Q. And on what occasion was that? A. The timethat time when they had a hit and run drive on me; the time I hit the car.
"Q. Were you arrested at that time? A. I was arrested. * * *
"Q. You say on one previous occasion you had left your car at the parking lot there at the patrol station? A. Yes, sir.
"Q. The same way as you did on this occasion? A. Just the same way."
Trooper Hoevelmann denied that the car was under the control of the state highway patrol. "It was left there, I think apparently under the same circumstances of Earnie Campbell believing that it should stay there probably. He wasn't advised to leave the car. * * * He could have had somebody come and get it." Hoevelmann said that, on the morning of April 9, when Groover looked through the car window and identified the property, he (Hoevelmann) "advised him to secure a search warrant."
Defendant's arrest without a warrant was not unlawful. Members of the state highway patrol (with certain exceptions not pertinent here) are "officers of the state" and "have the powers * * * vested by law in peace officers except the serving or execution of civil process." Sec. 43.190. All section references are to both RSMo 1949 and V.A.M.S. "Generally an officer may, without a warrant, arrest a person whom he has probable cause to believe guilty of a felony." 6 C.J.S., Arrest, § 6, p. 587. See State v. Nolan, 354 Mo. 980, 192 S.W.2d 1016, 1019[6]; State v. Johnson, 362 Mo. 833, 245 S.W.2d 43, 48[7-9]; State v. Williams, Mo.Sup., 14 S.W.2d 434, 435 [2]; State of Missouri ex rel., and to Use of Ward v. Fidelity & Deposit Co. of Maryland, 8 Cir., 179 F.2d 327, 331[3]. As the instant trial court pointed out, it is the state highway patrol's duty, "if they are notified that a crime has been committed and any evidence or clues given, * * * to investigate (See Sec. 43.180) and it is their duty to act upon the information they have. * * * Mr. Groover went in the next morning and said that a crime had been committed at his place. * * * And he told them of two of the parties, and he gave them a description of a car involved there in the crime. * * * And they found a car that fit that description." We hold that Trooper Hoevelmann had reasonable grounds for believing that defendant was the driver of the car at Groover's sawmill on the evening of April 7, 1952. Compare State v. Jonas, Mo.Sup., 260 S.W.2d 3, 5[4, 5]; contrast State v. Cuezze, Mo.Sup., 249 S.W.2d 373, 375[1].
Members of the state highway patrol do "not have the right or power of search nor * * * the right or power of seizure except to take from any person under arrest or about to be arrested deadly or dangerous weapons in the possession of such person." Sec. 43.200. See State v. Jones, 358, Mo. 398, 214 S.W.2d 705. At the hearing on his motion to suppress, defendant argued that the two patrolmen had *9 unlawfully "searched" his car at the time of his arrest by walking by it, looking through the window and observing the tire and rim. Such a contention was expressly ruled, adversely to instant defendant, in State v. Hawkins, 362 Mo. 152, 240 S.W.2d 688, wherein, as here, the stolen property, uncovered and lying upon the back seat of a parked car, was identified by observation through the car's windows. We said: "Observation of that which is open to view is not a search. A search (such as is prohibited by the constitutional provisions invoked) is not made by merely looking at that which can be seen." 240 S.W.2d 692[3-5].
The record does not sustain defendant's new trial motion assignment that the evidence he moved to suppress was obtained by the state highway patrol "without a search warrant." The uncontradicted evidence was that the tire, tube and rim were taken from defendant's car by the sheriff under a proper search warrant. See Secs. 542.260-542.290; Supreme Court Rules 33.01, 33.02. There was no evidence whatsoever that, en route to the patrol station, Trooper Hoevelmann searched defendant's car or that any member of the patrol, at any time while the car was parked on the patrol lot, searched the car or even opened its unlocked doors.
Nor does the record sustain defendant's contention, at the hearing on his motion to suppress, that Trooper Hoevelmann "seized" his car. Under defendant's own testimony, after his arrest he drove his car to the patrol station and parked it on the patrol lot; and, when Hoevelmann asked for the car keys and said, "I want to lock it to keep the thieves out," defendant handed over the keys without comment, protest or request that Hoevelmann deliver the keys to someone or drive the car somewhere and leave it. Defendant had left his car on the patrol lot on the occasion of a previous arrest, "just the same way as he did on this occasion." Defendant's version was thus strongly corroborative of Hoevelmann's denial of any patrol control of defendant's car and of Hoevelmann's opinion that defendant parked his car on the patrol lot "apparently * * * believing that it would stay there probably. He wasn't advised to leave the car. * * * He could have had somebody come and get it." We rule that there was no "seizure" of defendant's car by the patrol. Contrast State v. Jones, 358, Mo. 398, 214 S.W.2d 705, 707[4], wherein the defendant, after his arrest, handed his car keys to the state highway patrolman with a request that his car be taken to the farm of his wife.
The judgment is affirmed.
VAN OSDOL and COIL, CC., concur.
PER CURIAM.
The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.
All concur.