THE STATE v. JAMES RICHARDSON, Appellant.—102 S. W. (2d) 653.

Division Two, March 11, 1937.

*Harry J. Fair* for appellant.

*Roy McKittrick*, Attorney General, and *Wm. W. Barnes*, Assistant Attorney General, for respondent.

WESTHUES, C.—Appellant appealed from a conviction of murder in the first degree. His punishment was assessed at death. The information charged the crime to have been committed near Laredo, Grundy County, Missouri, on May 30, 1935. The information charged that James Richardson, Ellis Nave and Gilbert Glidewell had shot and killed one Elmer Davis. Appellant was granted a severance.

The evidence, omitting many of the details not material to the issues here, disclosed the following to have occurred. The deceased was a farmer living near the limits of the town of Laredo. On the evening of May 30, 1935, about nine P. M., deceased was notified, by one of his neighbors, that a car had parked in the street near his home and that three men had been in his garage. Deceased dressed and went to his garage where he noticed that the cap was missing from the gas tank of his car. Later deceased and a neighbor by the name of Ragan Pence went to where the defendant's car was parked.

Pence had a truck which he parked just ahead of defendant's car. Deceased and Pence then questioned appellant and his two companions. Appellant and his companions informed deceased that they were from Brookfield and had come to Laredo to decorate a grave; that they ran out of gasoline and having no money they attempted to steal gas from deceased's car in order that they might return home. After some further conversation deceased and Pence suggested that they would go to a filling station in Laredo and buy them some gas. This was agreeable to appellant and his companions. Deceased was to ride with the men in the car. Pence thereupon drove his truck up the road a short distance and turned, intending to go to the filling station. At the time he made the turn a car passed him from the direction where he had been talking to appellant. On his return he failed to find the car with the three men and Davis. It was then discovered that Davis had been shot. He was taken to a hospital at Trenton, where he died on the morning of June 2. Appellant and his two companions were arrested the following day by police officers in St. Joseph, Missouri. They were taken to the police station and questioned. All admitted that they had been at Laredo the night before and also admitted the shooting of Davis. The men were then taken to the Trenton hospital where deceased identified each one and accused them of having shot him. Deceased pointed out Glidewell as the driver of the car; appellant, Richardson, as having occupied the front seat beside the driver and Nave as having been in the back seat. This was admitted by the men to have been true. They were then asked who had shot Davis. Nave and appellant each admitted that he had shot once, but Glidewell denied that he shot. Davis then made the assertion that someone had lied as he had been shot three times. Thereupon appellant volunteered that he was terribly excited and may have shot twice. In no statement made by appellant, in the police station in St. Joseph, in the hospital in the presence of Davis, or later in a signed confession, did he ever hint at any fact that would suggest he shot Davis in self-defense. The only reason he gave was that he was afraid Davis and Pence were going to turn them over to the officers and that he was excited. We may pause to state that the three men had good reason to fear the officers of the law, as it later developed that they had been on a crime committing spree and had perpetrated a number of robberies, and also had burglarized a number of homes and stores all within the month of May, 1935.

A witness testified without objection as follows: "Mr. Davis told me that he was on the running board talking to him, standing on the running board, talking to them when Mr. Pence left and that then the driver of the car attempted to start the car and he, Davis, reached over to pull out the key and something hit him in the neck.

"Q. What, if anything, did he say with reference to what it was hit him in the neck? A. Well he was shot in the neck, he showed me the hole."

This evidence coincides with that of appellant, except that he testified that at the time Davis reached in the car he thought Davis had a gun and was going to shoot him. Note his testimony:

"A. Well we was parked west of Laredo, Mr. Pence and Mr. Davis came up in a car; stopped in the front of our car, Mr. Davis came back to our car and says have you been trying to steal gasoline, we said we tried but we couldn't get any, he says—he asked us our names, where we lived, who our folks was, he asked us what we was doing in Laredo, he was told we was there to decorate a grave, and he talked to us awhile, questioned us about this gasoline, and Mr. Pence got in his car and started back to town, and Mr. Davis—in the meantime our car has started, the motor was started in the car I was in, and in the meantime Mr. Davis got on the running board and the motor was started; he reached through past the driver and I thought that he had a gun, I didn't know but it was my impression.

"Q. Just tell whether it was light or dark at that time? A. It was dark, just a dim flashlight, a very dim one, and he reached through the car in through the car and I shot him once or maybe twice, I don't remember; the car started; we went on up the road and he appeared to me like he jumped off of our car we came on in where we was apprehended at St. Joseph. . . .

"Q. When you saw him reach through there as you testified, describe to the jury your feelings, as to being excited or otherwise? A. Well I was excited.

"Q. Why? A. Well I thought he was going to shoot.

"Q. Well now did this reaching through and this getting up on the running board occupy much time or how was it done, suddenly or how? A. Suddenly, yes sir.

"Q. What had Mr. Davis said to you occupants of the car, if anything, after Mr. Pence left and immediately before the time you started the motor, or the motor was started by Glidewell, as has been testified to, and the time that he reached in to the car? A. He told us that he was going to take us back to Laredo and I don't just recall the names, but he mentioned I imagine the peace officers; that he would let him question us. . . .

Q. Well did he—what was his manner in making these statements to you people in the car was it threatening or otherwise? A. Well I wouldn't just exactly call it threatening, although he seemed quite a bit irritated, he was you might say on the verge of getting angry, I wouldn't say that he was angry.

"Q. By his demeanor and action immediately there before the car started were you put on your guard to shoot or anything? A. No

sir, up until the time he reached in through the car, when he reached in the car my first thought was he was going to shoot me."

On cross-examination he testified:

"Q. When he reached his hand in why didn't you let him do what you thought he was going to do? A. I didn't want to die.

"Q. Did you see a weapon in his hand? A. No sir.

"Q. Then what made you think you were going to die? A. I couldn't see what he had in his hand, whether anything or not.

"Q. You just imagined he had a gun? A. Yes sir. . . .

"Q. Now until Mr. Davis stepped on the running board you yourself admit that he never made one single threat at you or the other two boys? A. No sir.

"Q. After he stepped on that running board from there until you fired you still didn't hear him make one single threat? A. Not that I recall, no.

"Q. The only thing that he did was when you boys started up he got on the running board and reached in and toward the dash, is that right? A. Yes sir. . . .

"A. He reached his hand in the car, yes sir.

"Q. And as you already said you saw no weapon in his hand? A. I couldn't say I didn't see none."

Additional facts will be related in the course of the opinion.

█ Appellant in his motion for new trial asserted that the trial court erred in admitting in evidence signed and also oral statements made by the defendant. These statements were made by the defendant at the police station in St. Joseph, Missouri, at the hospital in Trenton, Missouri, and in the prosecutor's office in Trenton. It is asserted that the statements were not voluntary. The trial court heard evidence upon this question and we are of the opinion that the statements were admissible in evidence. No showing was made, nor was it contended that appellant had been mistreated or was promised any leniency. He was informed that any statement he might make would be used against him and that he did not have to make any statement. This evidence was offered by the State. Appellant did not introduce any evidence in support of his contention. Stress was laid upon the fact that the officers did not advise appellant to get a lawyer. We do not believe that before questioning a man charged with crime the law requires the officers to send for a lawyer to represent him. Under the circumstances the statements were admissible. [State v. McDaniel, 336 Mo. 656, 80 S. W. (2d) 185, l. c. 193 (7); State v. Payne, 331 Mo. 996, 56 S. W. (2d) 116, l. c. 118 (6, 7).]

█ Appellant also contends that the trial court erred in admitting the State's Exhibit (2), which was the alleged signed confession made at the prosecutor's office in Trenton, because the confession contained evidence of many other crimes not connected with the

one charged in the information. This would, no doubt, have been a serious question had the defendant made any objection thereto at the trial. We have, however, carefully examined the bill of exceptions and were unable to find any objection made of the nature now urged. The question, therefore, is not before us for review.

█ In another assignment of error appellant contends that an alleged dying declaration was erroneously admitted in evidence because the State failed to show that the declarant believed at the time that death was impending. This question was not briefed. The evidence showed that deceased's spinal cord was severed by one of the bullets, resulting in total paralysis in the lower part of the body; that the deceased, while fully conscious and in full possession of his mental faculties, grew rapidly weaker and fully realized that death was soon to overtake him. The statements made by deceased were admissible as dying declarations. [State v. Anderson, 34 S. W. (2d) 25.]

█ The State introduced evidence, that a few days prior to the shooting of Davis appellant participated in a robbery of the Lafferty Drug Store at Trenton, Missouri, and at that time he shot at the person in charge of the store. The State attempted to justify the admission of this evidence on the theory that it tended to show motive; also that the defendant was in the vicinity at that time. Appellant is in no position to urge this assignment of error for a reversal of this case for the reason that the State was permitted to make proof of this alleged robbery without any objection being made by appellant. In the confession signed by appellant and his two companions the following appeared:

"On the night of the 26th of May, 1935, we robbed the Northeast Pharmacy in Trenton, Missouri, Glidewell and Richardson going into the store and Nave waiting in the car outside. James Richardson, on this job, fired one shot at Frank Lafferty, the proprietor of the store."

Later in the trial Lafferty testified and then appellant objected to the evidence. Having failed to object to the evidence when first offered, appellant waived its competency. In 64 Corpus Juris, 168, section 190, we read:

"It is very generally held that a failure to object to evidence at the time it is offered is a waiver of all objections to its admissibility. The waiver is operative not only as affecting subsequent proceedings on the trial, but also as affecting the right to have questions of its admissibility reviewed on appeal or writ of error."

And at page 171 of the same volume, Section 192, we note the following:

"A party who fails to object to the admission of evidence waives objections to the subsequent admission of the same or similar evi-

dence. . . ." [See, also, State v. Lehman, 175 Mo. 619, l. c. 625, 75 S. W. 139; Sullivan v. Union Electric Light & Power Co., .331 Mo. 1065, 56 S. W. (2d) 97, l. c. 104 (17); State v. White, 299 Mo. 599, 253 S. W. 724, l. c. 727.] The evidence of Lafferty added nothing to what appellant had stated in his signed confession. Had the trial court, therefore, excluded Lafferty's testimony the facts would still have been before the jury. We are, therefore, not authorized to reverse the judgment for an alleged error that was in any event harmless.

In the motion for new trial we find the following assignment of error:

■ "The court erred in submitting Instruction No. S1, to the jury in this, to-wit: The jury were improperly instructed upon the meaning of the word 'deliberately' as used in said instruction."

This assignment fails to point out with particularity any error in the instruction. It, therefore, fails to meet the requirement of the statute. [State v. Shawley, 334 Mo. 352, 67 S. W. (2d) 74, l. c. 86 (23, 25); State v. Majors, 329 Mo. 148, 44 S. W. (2d) 163, l. c. 166 (5); State v. Buckner, 80 S. W. (2d) 167, l. c. 169, 170 (10, 11), and cases there cited; State v. Vigus, 66 S. W. (2d) 854, 856 (5, 6); State v. Fisher, 46 S. W. (2d) 555, l. c. 556 (1, 2); State v. Bailey, 320 Mo. 271, 8 S. W. (2d) 57, l. c. 60 (7).]

■ Appellant has briefed a number of points pertaining to various portions of the closing argument of the State's attorney. The argument was preserved in the bill of exceptions. Upon examination we find that appellant only made two objections thereto and we will confine our discussion to the assignments based upon these objections. The first is disclosed by the bill of exceptions as follows:

"The evidence is, men, that Elmer Davis stood there for ten or fifteen minutes with his right hand on that door opening from the front. Now I want you to picture that here is a man seated right here in the front seat of an automobile; here is the front of this door; here the hinges—it opens back; here is the edge of the door out there; there sits the defendant; here stands Elmer Davis with his right hand and open on that door for 10 or 15 minutes, and then when the door closed the car started up and he has never been in his pocket, it has never been in any part of his clothing. This man, he sat there for 15 minutes and looked at Elmer Davis' open right hand. He now says 'when that open hand came in the car even though I had looked at it 15 minutes, I thought it had a gun in it.'

"MR. FAIR: A moment the Court please, the defendant objects to that line or argument for the reason it is not in evidence that Mr. Davis had his open hand on the door or otherwise, was no testimony to that by any witness.

"MR. MOORE: Mr. Pence testified to that, I submit.

"THE COURT: The jury will remember the evidence."

It is apparent that the argument of the prosecutor was entirely proper. It was a legitimate conclusion deducted from the evidence in the case. Obviously there was no error for the trial court to overrule appellant's objection. The other objection was made while the State's attorney was pleading for the infliction of the death penalty. The bill of exceptions discloses the following:

"The time has come, and it's here now when men such as you and your neighbors, when they are called by the court to come in here and sit on a jury, must say there is no other way out; you must say Grundy County is not a fertile field for highwaymen. If you want to burglarize and murder and kill and pilfer, go some place else other than here. We are not going to put up with it and we are going to stamp it out, and the only way we can do it is for twelve good men like you to have manhood and red blood in your veins when you go in that jury room.

"Oh, I hope there is not a weak man on this jury. When you go into your jury room if there should be a man on this jury who will say I haven't got the heart to do it, say to him, Mr. Juror, it could have been you.

"MR. FAIR: The Court please, defendant objects to that line of argument by the State.

"THE COURT: Objection overruled.

"To which ruling of the Court the defendant by counsel then and there duly excepted at the time and still excepts."

We are of the opinion that the prosecutor remained within the rules in making the argument referred to. [State v. Hart, 237 S. W. 473, l. c. 481, 292 Mo. 74, l. c. 97, 99; State v. Hawley, 51 S. W. (2d) 77, l. c. 78 (6).] Appellant's own evidence disclosed that he was in the act of burglarizing a garage and pilfering gas immediately prior to the homicide. It was all one continuous transaction. In view of the record it is not surprising that the death penalty was requested by the prosecuting officials. It is urged in the brief that other portions of the State's attorney's argument were improper, but since no objection was made thereto at the trial the record presents nothing for our review.

█ Appellant urges that the trial court erred in not instructing on manslaughter. It is insisted that defendant was excited at the time he fired the fatal shots. In order to justify a manslaughter instruction on that ground there must be some reason recognized by law for the existence of the state of excitement. The only reason, disclosed by the evidence, that caused appellant to be excited was that he feared he would be discovered by the officers and would be brought to justice for one or more of the crimes he had perpetrated within the previous month. Excitement thus aroused does not re-

duce a homicide to manslaughter, nor does it authorize an instruction thereon. In fact the evidence of appellant in this case, if considered as true, does not establish reasonable cause for him to believe that he was in such danger as to justify shooting in self-defense. It is not enough that the appellant believed he was in danger, but he must have had reasonable grounds for so believing. His own evidence did not disclose any reasonable ground for apprehension. That being true the evidence certainly did not justify a manslaughter instruction. The facts in the cases cited by appellant, which hold that a manslaughter instruction should have been given, are so different from the facts at bar that they are not in point. A lengthy and instructive discussion of this question may be found in State v. Creighton, 330 Mo. 1176, 52 S. W. (2d) 556, l. c. 562, where this court said:

"If there is substantial evidence of lawful provocation, the defendant is entitled to an instruction on manslaughter. Proof of an initial assault and battery upon him by the deceased is such evidence because it measures up to the standard exacted by the law and in point of fact warrants an inference that heat of passion was engendered thereby."

There was no such evidence introduced in this case. Appellant testified that deceased made no threats, and no act of deceased indicated any intention on his part of assaulting appellant, except that deceased reached toward the dashboard for the key. Appellant and his companions evidently sat in the car with their guns ready for action and immediately after Pence left they attempted to escape and when deceased reached for the ignition key they shot him and drove away. The point is ruled against appellant.

This case presents a typical example of the old adage, "crime does not pay." The evidence amply justified the infliction of the extreme penalty. We have examined the record proper and find it free from error. The judgment is affirmed. *Cooley* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.

Date of the execution fixed by the court for Friday, April 16, 1937.