STATE v. LAFAYETTE J. PIPPIN, Appellant.—No. 40650.—209 S. W. (2d) 132.

Division Two, March 8, 1948.

*Joseph M. Bone, Jr.*, for appellant.

*J. E. Taylor*, Attorney General, and *Will F. Berry, Jr.*, Assistant Attorney General, for respondent.

[132] LEEDY, P. J.—Lafayette J. Pippin was convicted in the Audrain Circuit Court of larceny of a motor vehicle, a felony under Sec. 8404, R. S. '39 and Mo. R. S A. (All references to statutes are to R. S. Mo. '39 and the corresponding sections of Mo. R. S. A., unless otherwise expressly noted.) His punishment was fixed at a term of eight years imprisonment in the penitentiary, and he appealed, but he has filed no brief in this court. Review will be limited to such of the assignments of his motion for a new trial as are suf-

ficient to preserve anything for review under Sec. 4125. As thus limited, the principal question is defendant's challenge of the sufficiency of the evidence. His contention is that the state failed to make a prima facie case because: (1) the evidence failed to show (a) any actual or constructive criminal intent of the defendant to steal the automobile, (b) that the defendant asserted or attempted to assert any right, claim or control over said automobile or permanently deprive the owner thereof; and (2) because "the evidence on the part of the defendant proved a reasonable, rational and probable explanation of the defendant's association with . . . Lorna Barr, and his connection, if any, with the . . . automobile . . . and that said explanation was consonant with innocence and was not proven false by the state."

The offense is alleged to have been committed on July 7, 1946, in Audrain County, in which county the prosecuting witness and owner of the car, Mrs. Ethel Barr, resided on a farm near Farber with her husband, her son, Myrle Barr (aged 33), and the latter's wife Lorna May, and also the three children of Lorna May (aged 4, 8 and 10) born of her previous marriage.

The evidence is undisputed that on the Sunday morning in question Lorna May took her mother-in-law's car from the Barr farm without the knowledge or consent of the owner, or of any other adult member of the household. Accompanied by two of her children, she drove it to Vandalia, in the same county, where she was joined by defendant. From his own testimony, as well as from statements made by him and shown by the state, it appears that there was thus begun a trip in the mother-in-law's car which carried defendant, [133] Lona May and her two children to Chicago, thence back to St. Louis and Joplin, Mo., Bartlesville, Okla., Denver, Colo., and finally to Portland, Ore. During this trip defendant and Lorna May lived together as man and wife. Indeed, he introduced her to his mother in Bartlesville as his wife. At Denver he sold the car to a dealer with whom he had become acquainted through his brother. The sale price was $390.00, of which $175.00 was paid in cash, the balance to be paid on delivery of the certificate of title, a contingency which did not occur. He and Lorna May divided the $175.00 thus obtained, and resumed their travels by bus, finally reaching Portland, where they separated.

The background of this unconventional conduct was this: Defendant was a stranger in the Vandalia-Farber community. He was employed as a cook for an extra gang on the railroad, and was temporarily "on location" at Vandalia, having been there only two weeks when, on the night of July 4, 1946, he became acquainted with Myrle and Lorna May at a "dine-and-dance" place known as "Effie's Tavern", located on the highway west of Vandalia. The defendant at that time introduced himself to them as "John Wells", and rep-

resented himself as a musician.. He accompanied Myrle and Lorna May to the Barr farm and spent the night there, whether by invitation of Lorna May and over the protest of Myrle, as testified by the latter, or by joint invitation of Myrle and Lorna May, as related by defendant, is not entirely clear nor important. In any event, according to defendant's statement made to the officers, after he had retired that night, Lorna May came to his room and got in bed with him. On the next morning she drove him to Vandalia, and it was on this occasion that they "talked about leaving Missouri."

Myrle and Lorna May again went to "Effie's Tavern" on Saturday night, the 6th of July, meeting up with the defendant at that place once more. The following morning Myrle slept late as a result of having taken a sedative, and upon awakening discovered his wife was gone, as was his mother's car. It further appeared that Lorna May did not have the unrestricted right to use the car, being allowed to do so, according to the state's evidence, only after prior arrangements were made with other members of the family.

Myrle testified that on the night of July 6th, although he did not converse with defendant at "Effie's Tavern", his wife did, and he overheard a part of their conversation in which defendant displayed a ticket, and stated that he could take the ticket back and get a refund.

The car was recovered in Colorado, and restored to its owner. Defendant was apprehended in Portland, and returned to Audrain County for trial. Myrle had married Lorna May less than 60 days before the date of the alleged offense, and he obtained a divorce in December, 1946. For aught that appears of record, Lorna May was not charged with the offense. She did not testify, nor was any reference made to her then whereabouts. .

Defendant corroborated Myrle as to the time and place they became acquainted and as to spending the night of July 4 at the Barr home, and being driven to Vandalia by Lorna May the next morning. He testified that on the night of the 6th Lorna May "wanted to know if I would leave with her," and he replied, "in a joking way, 'yes'." The conversation was interrupted because Myrle "came up." He further testified that the following morning, it being Sunday, (and he had previously purchased a bus ticket to Chicago) he was sitting in the park at Vandalia visiting with a friend when Lorna May walked up and the following occurred: She said "she was going on a little trip and wanted to know if I would ride with her.

Q. What did you say to that?

A. Well, I said I was going to Chicago anyway to get a check, so I would go to Chicago with her.

Q. All right, then what was done?

A. Well, we left . . . I got in the car, . . . She drove off."

Defendant on cross-examination admitted numerous former convictions, including charges of forgery and the larceny of two automobiles, sentences thereunder, and incarceration in the penitentiary.

[134] We think there was ample evidence from which the jury might find the existence of an intent on defendant's part to steal the car, and permanently deprive the owner of it. The fact that he later sold it is, under this record, sufficient to show that he had such intent at the time of the taking. As to the proposition of his explanation, it is sufficient to say that the state's case does not rest alone on defendant's possession of recently stolen property. There was other inculpatory evidence, as shown by the foregoing facts. The jury was at liberty to believe or disbelieve his explanation. The question of his guilt was clearly one for the jury.

Defendant made oral statements to officers while under arrest concerning the offense, and the motion for new trial complains of their introduction because they were not voluntary. The record does not support the assignment. No such objection was interposed at the trial, nor was there anything in the proof tending to show the statements were not voluntarily made. ". . . The facts that he was under arrest, not represented by counsel and not advised that the statement might be used against him do not render the statement inadmissible, there being nothing in the record indicating that any improper methods were employed to induce it or tending to show that it was not voluntary. We discussed this question in State v. McGuire, 327 Mo. 1176, 39 S. W. 2d 523, which see, with cases there cited. See also on this point State v. Hoskins, 327 Mo. 313, 36 S. W. 2d 909. There was no prejudicial error in the admission of the statement." State v. Evans, 345 Mo. 398, 406, 133 S. W. 2d 389, 393.

Complaint is also made touching the closing argument of the prosecuting attorney. We have examined the argument and find that no objections were interposed to the alleged objectionable matter. In this situation we are not required to examine the complaint.

The record proper has been examined, and we find no reversible error therein. Judgment affirmed. All concur.