**STATE of Missouri, Respondent,**

**v.**

**Charles (Chuck) TURNBOUGH and B. L. (Jack) Clifton, Appellants.**

No. 50828.

Supreme Court of Missouri,

Division No. 2.

April 12, 1965.

Thomas F. Eagleton, Atty. Gen., Clyde Burch, Asst. Atty. Gen., Jefferson City, for respondent.

Robert A. McIlrath, Flat River, for appellant.

STORCKMAN, Presiding Judge.

The defendants Charles (Chuck) Turnbough and B. L. (Jack) Clifton were jointly charged, tried and convicted of arson. Section 560.025, RSMo 1959, V.A.M.S. They duly filed a joint motion for new trial which was overruled and each was sentenced to a two-year term of imprisonment in accordance with the verdict of the jury.

■ The defendants were represented at the trial by counsel of their own choice. Their counsel filed a notice of appeal for each of them and approved the transcript of the record on appeal but did not file a brief on their behalf in this court. The attorney general has completely briefed the case on behalf of the state. In this situation we review on appeal all assignments of error properly preserved in the motion for new trial and the essential portions of the record. S.Ct. Rules 27.20, 28.02 and 28.08, V.A.M.R.; State v. Williams, Mo., 376 S.W.2d 133, 134[1].

■ The motion for new trial contains ten assignments of error, four of which relate to statements made by the prosecuting attorney during oral argument. However, the argument of counsel is entirely omitted from the transcript of the record. Where argument of counsel is alleged to be erroneous and the argument is not included in the transcript of the record, nothing is presented for appellate review since the assignments in the motion for new trial standing alone

prove nothing. State v. Ronimous, Mo., 319 S.W.2d 565, 567[4].

The defendants contend that the trial court erred in refusing to give their instructions directing acquittals at the close of the state's evidence as well as similar instructions offered at the close of all the evidence. After the instructions were refused at the close of the state's evidence, both defendants testified and introduced other evidence in their behalf. Where a defendant adduces evidence in his own behalf, he waives his right to claim error in the overruling of his motion for a judgment of acquittal offered at the close of the state's case and the sufficiency of the evidence to support the verdict must be determined upon the entire evidence. State v. Davis, Mo., 365 S.W.2d 577, 579[3].

The allegation of error in the motion is that a judgment of acquittal should have been entered at the close of all the evidence because the state did not prove all the elements of the crime charged. In determining the sufficiency of the evidence to support the conviction, the appellate court must consider as true all evidence favorable to the state together with inferences that can reasonably be drawn therefrom and must reject contrary evidence. State v. Sykes, Mo., 372 S.W.2d 24, 26[3].

In December 1962, the defendant Turnbough began the operation of the M.F.A. Service Station located at the Junction of Highways 72 and 67 in or near Fredericktown. The land and building were owned by Floyd D. Randolph and Louise W. Randolph, his wife. The defendant Turnbough owned the tools, tires, and other personal property connected with the operation of the business. The defendant Clifton had been employed by Turnbough since sometime in May 1963 as an attendant at the service station. On June 5, 1963, a fire occurred in the building located on the premises. The fire department attacked the fire with "high pressure fog streams" through an open window at the rear of the building. After the fire was extinguished and the building could be entered, an examination was made to determine the cause of the fire. Under the open window, Fire Chief Marvin Graham found a five-gallon open can or bucket containing approximately two gallons of gasoline and some towels. Near the middle of the room was a five-gallon can containing some gasoline with the covers removed from two openings on the top. There was another can of a gallon or gallon-and-a-half capacity which smelled of gasoline. The fire chief testified that the fire started near the rear wall under the window, burned its way through a rack of tires, and on up to the ceiling. The building was constructed of concrete blocks but had a wooden partition and wooden roof. Defendant Turnbough was in St. Louis at the time of the fire. Defendant Clifton was not in Fredericktown but returned later that night.

There was evidence that the defendant Turnbough took an inventory of all the stock about five days before the fire and removed or caused to be removed from the service station building tools, tires, and other merchandise. Clifford "Red" Francis who was serving a penitentiary sentence on another offense at the time of the trial testified that about four weeks before the fire Turnbough offered him and his brother-in-law $200 to burn the station, but Francis refused. About three weeks before the fire, in the presence of defendant Clifton, Turnbough told Francis and Clifton he wanted them to burn the station, but they decided not to do it. About three days before the fire, which was after Turnbough had gone to St. Louis on his vacation, Clifton called Francis to the station where Clifton was talking to a boy known to Francis as Scroungey. Clifton said he got Scroungey to do the job for $100 but Scroungey never did say whether he would or would not do it. Harold Wayne Rolens, a part-time employee at the service station, and apparently the boy nick-named Scroungey, testified that he went to the station at about 2 p. m. on the day of the fire and found Red Francis and Jack Clifton there. Clifton asked Rolens if he wanted

to make some money by burning the station; Rolens said he didn't want any part of it and left. When Rolens came back to work at 4 p. m., Clifton and Francis were there and Clifton asked him again to burn the station. Francis said he wouldn't have to worry about anything if he kept his mouth shut. After a while, Rolens told them he would do it. When he closed the station at 8 p. m., Rolens went to his girl's house about a half a block from the station where he stayed until about 9:45 p. m. He then called a taxicab to pick him up at the service station. Rolens then walked to the station, sent the taxicab around the corner, went to the back of the building and dropped a lighted match through an open window into the bucket containing shop towels and gasoline. Rolens then went to where the taxicab was parked and was driven to his home. He further testified that Jack Clifton was the one that told him he would get $100 for burning the place. Two days after the fire, Rolens went to the Turnbough home in response to a call. Clifton was also there and Turnbough told them to go along with anything he told the adjuster for the fire insurance company. On two or three occasions Rolens went to Clifton's home and asked him if he had been paid and if Turnbough had settled his insurance claim. The day before they were arrested, Turnbough and Clifton met Rolens on a side road pursuant to arrangement; they told him if he was "picked up" to try and lie his way out of it and around a lie detector test. Rolens pleaded guilty to a lesser offense and was placed on probation.

Two highway patrolmen testified that they took statements from Turnbough and Clifton and related the circumstances and some of the conversations they had with the defendants, all of which were included in the statements. In his written statement dated September 13, 1963, the defendant Turnbough stated that a fire started and burned a hole in the roof about a week after he opened the station in December 1962. About a month prior to June 5, 1963, he got acquainted with Red Francis who did some mechanical work for him. The statement

further recites: "I don't know how it come about—but the first fire was mentioned one day, and he [Francis] said how come you didn't collect from the insurance company and I said nothing was damaged. I said something like I wished the place had burned to the ground so I could have collected the insurance. Then Red said what would it be worth to you to have the place burned down—would you give $200 to have the place burned, and I said sure. This came up several times after this. He said will you still give me $200 to burn the place down and I said sure. The day that I left on my vacation Red was at my station. When I started to drive off Red said: 'Is it still worth $200 for this station to burn down, and I said sure, go ahead.' If this is making arrangements with Red to burn the station then I made them."

In the first statement taken from the defendant Clifton dated September 13, 1963, he denied that Turnbough had made any arrangements with him to burn the station, but told of conversations with Red Francis in which Francis said that Turnbough had propositioned him to do so but he was not going to do it because Turnbough "had told too many people." The second statement taken from Clifton on September 18, 1963, contained these questions and answers:

"Q. Did Chuck Turnbough hire you and Clifford (Red) Francis to burn the M.F.A. Service Station that he was operating on Highway 67? A. Yes he talked to Red and me about burning the M.F.A. Station that he was operating, he said he would give us $200.00 to burn the station. Q. When did Charles Chuck Turnbough first talk to you and Red Francis about burning the station? A. It was two or three weeks before it burned that he taked [sic] to us about burning the place. Q. Where were you when he first talked to you about burning the station? A. I was working at the station for him. He also talked to Red at the same time. Q. What was his reason for wanting the station burned? A. He said he was not making anything

and was going behind every day he run the place, and wanted us to burn it so he could collect the insurance on the place. Q. Was there any set time or date for you and Red Francis to burn the station at the time Turnbough talked to you in May 1963, about burning it? A. No there was [no] set time he just said to burn it when we got ready. Q. What agreement did you and Red have with Turnbough about being paid to burn the station? A. He was to pay Red the $200.00 and Red was supposed to pay me my $100.00. We were not supposed to be paid until Turnbough got his insurance money. Q. How long was it after you and Red Francis agreed to burn the station was it that you and Red talked to the Rolens boy about burning the station? A. We did not talk to the Rolens boy until the day it burned about burning it. It was about 1:00 p. m. in the afternoon that we talked to him there at the station about burning it. There was nobody there but Harold Rolens, Red Francis and me. Q. How did you and Red Francis approach the Rolens boy about burning the station, by that I mean what did you first say to him about burning the station? A. I ask him if he would like to make $100.00, and he said doing what. I told him that Chuck said he would give him $100.00 to burn the station. He first said he might get caught and then said he would burn it for the $100.00. Q. Did Rolens say he would burn the station that night? A. No he did not say he would burn it that night, but he would burn it. Q. Did you and Red Francis tell Rolens you were supposed to get $200.00 from Turnbough to burn the station? A. No we did not. * * * Q. When was the first time after the M.F.A. Station burned that you talked to Red Francis and Charles (Chuck) Turnbough about the place burning? A. I talked them the next morning about 11:a. m. at the station. Q. What did you and them talk about in regard to the station burning that morning? A. Red Francis said he did not think the Rolens boy would have guts enough to

burn the place and Chuck said he did not think he would either. I said that I wished he did not now, and I was going to try to talk him out of it if I had of got to see him again before he burned it." The statement also dealt with the property and merchandise taken from the station before the fire. Another statement taken on October 26, 1963, reaffirmed the truth of the September 18th statement but added no new facts.

On the stand Clifton denied he had arranged with anyone to burn the station and in effect said all the information he had and passed on was what Red Francis told him. He acknowledged that he gave the statements voluntarily and that he knew their contents before he signed them. Turnbough also denied that he procured anyone to burn the station. Both Clifton and Turnbough testified that because of the previous fire in December 1962 and an earlier one at another station he had operated there was much joking by customers and others about whether there was going to be another fire; it was "kind of a standing joke around there."

█ The evidence was clearly sufficient to support the verdict as to each of the defendants. State v. Ferrara, Mo., 320 S.W.2d 540, 544 [1]; State v. Rudman, 327 Mo. 260, 37 S.W.2d 409, 410 [1]; State v. Sheline, Mo., 225 S.W. 673, 674 [1]. The court did not err in refusing to direct verdicts of acquittal.

█ The defendants assert that the trial court erred in allowing the fire chief, Marvin Graham, "to testify as to the origin of the fire, and the intensity of the heat." The assignment is of doubtful validity in view of its vagueness and lack of particularity. See S.Ct. Rule 27.20(a), and State v. Davis, Mo., 371 S.W.2d 270, 271–272 [2]. But we will pass that question and review the assignment on its merits. Mr. Graham had been a member of the fire department for 30 years, had witnessed near to 1,000 fires and had taken courses

in fire fighting at the University of Missouri. He was shown to be properly qualified as an expert in this field. He observed the fire while it was burning and in answer to questions testified that the fire started near the rear wall under the window and burned upward through a rack of rubber tires to the ceiling, and that the heat was most intense at that point. The defendants' objections that the questions called for opinion evidence and invaded the province of the jury are not well taken. State v. Paglino, Mo., 319 S.W.2d 613, 624 [15]. The court has a wide discretion in determining the admissibility of opinion evidence of this kind, and no abuse of discretion is shown by the record. State v. Menard, Mo., 331 S.W.2d 521, 524 [4]; 23 C.J.S. Criminal Law § 858(7), p. 397.

The motion for new trial further alleges that error was committed in allowing State Highway Patrolman R. C. Caldwell to testify to statements taken from the defendant Clifton after Mr. Caldwell knew that the defendant had hired an attorney. It appears, largely from the testimony of Mr. Caldwell, that he talked to defendant Clifton on September 14, 1963, and again on September 18, when a written statement was taken. On October 26 Mr. Caldwell again interviewed defendant Clifton and asked if anyone had talked to him about changing the statement he signed on September 18. Clifton replied in the negative and asked Caldwell if he was going to take another statement and Caldwell said he was not. Defendant Clifton then said that his attorney had told him to keep his mouth shut and not to sign any more statements. Caldwell asked if the written statement made on September 18 was true and Clifton said it was. Caldwell asked if Clifton was willing to sign a statement to that effect and Clifton said he was. Such a statement was signed before a notary public and the statement of September 18 was signed again. The evidence affirmatively shows that the statements made by defendant Clifton were entirely voluntary. In fact Clifton so testified when on the stand in his own behalf.

■ The evidence does not definitely show when Clifton hired his attorney, but Mr. Caldwell admitted he knew that Clifton had an attorney when he talked to him on October 26. The information was filed on September 16, 1963, but there is no evidence of when Clifton was arrested or at what time or times he was in custody. The first objection to this testimony of Caldwell was: "I want to object to this, if this statement was taken after he had hired an attorney and the State Patrolman knew about it. There was some of these statements that Mr. Caldwell took after an attorney was hired." Later Clifton's counsel stated: "I am certainly going to object to them using the testimony that they took when they knew I was attorney and wasn't present." Trooper Caldwell's testimony regarding the interview on October 26, 1963, was objected to in this fashion: "Now, if the Court please, I'm going to object to that. I know definitely that I, that I was attorney. He knew it at that time." When the written statements, exhibits F, G, H, I, and J, were offered in evidence, defendants' counsel made this objection: "Now, I'm going to object to all those that were taken after I was employed as an attorney and not informed that they were being taken so I could be present to represent my client at the time they were taken." The only evidence within the purview of the objections was that pertaining to the interview of October 26. Clifton did not request that his counsel be present and nothing was done to hinder or prevent the defendant from obtaining advice of counsel. In fact it appears that the defendant had advice of counsel on the subject matter and voluntarily chose not to follow it. All the evidence shows that his responses were voluntary. Since the record discloses that the defendant Clifton's right to counsel was not violated, the trial court did not err in overruling the objection. State v. Pippin, 357 Mo. 456, 209 S.W.2d 132, 134 [3, 4];

State v. Richardson, 340 Mo. 680, 102 S.W. 2d 653, 655 [2].

■ Since constitutional grounds were not specified in the objections or in the motion for new trial, no such grounds were preserved for appellate review. State v. Griffin, Mo., 339 S.W.2d 803, 805–806 [6], certiorari denied 366 U.S. 938, 81 S.Ct. 1666, 6 L.Ed.2d 849. We have, nevertheless, re-examined recent decisions of the Supreme Court of the United States including Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, and Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. Our rulings are not inconsistent with those decisions on the facts affirmatively appearing in this record.

■ The defendants' allegation that the ownership of the building at the time of the fire was not proved is not borne out by the transcript. On behalf of the state, M. W. Parkin, an abstractor whose qualifications were admitted, twice during his examination without objection testified that he had examined the records as of June 5, 1963, that the property was owned by Floyd D. Randolph and Louise D. Randolph, his wife, and that he knew the owners personally. The assignment is without merit and is denied. 6 C.J.S. Arson § 32, p. 754; 22A C.J.S. Criminal Law § 692, p. 911; 73 C.J.S. Property § 19, p. 214.

■ The defendants' final contention is that instruction No. 3 was not supported by the evidence. The instruction, in substance, told the jurors that they should find the defendants guilty if they believed from the evidence and beyond a reasonable doubt that the defendants Turnbough and Clifton entered into a conspiracy, agreement and common design with Clifford Francis to set fire to the building of Mr. and Mrs. Randolph, that thereafter Francis and Clifton, or either of them, in prosecution of the conspiracy procured Harold Wayne Rolens to set the fire and that Rolens on June 5, 1963, did set fire to and

burn the building although the defendants were not present when the building was set afire. The facts hypothesized clearly and faithfully conformed to the evidence. The instruction was supported by the evidence and the court did not err in giving it. See State v. Pease, Mo., 133 S.W.2d 409, 413–414 [8]; State v. Richards, Mo., 11 S.W.2d 1035, 1036 [2]; and State v. Strickland, Mo., 289 S.W. 557, 558 [3].

We have considered all assignments of error preserved in the defendants' motion for new trial and find them to be without merit. The defendants were present throughout the trial including their allocution and sentencing. We have examined the parts of the record and entries designated in S.Ct. Rules 28.02 and 28.08, V.A. M.R., and find them to be in proper form and free from error. Accordingly the judgment is affirmed.

All of the Judges concur.