Robert P. McCONNELL and Hilda A. McConnell, Respondents,

v.

PIC-WALSH FREIGHT COMPANY, a Corporation, Appellant.

No. 53162.

Supreme Court of Missouri, Division No. 1.

Sept. 9, 1968.

Motion for Rehearing or to Transfer to Court En Banc Denied Oct. 14, 1968.

**294**

Donald L. James, Daniel T. Rabbitt, Jr., Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for plaintiffs-respondents.

Paxton H. Ackerman, Ackerman, Schiller & Schwartz, Clayton, for defendant-appellant.

HOUSER, Commissioner.

Action by Robert P. McConnell for $175,000 damages for personal injuries and by his wife Hilda for $25,000 damages for loss of services and consortium, against Pic-Walsh Freight Company. From a judgment for $75,000 damages for personal injuries and $15,000 damages for loss of services, entered upon a jury verdict, defendant has appealed. We have jurisdiction because this appeal involves $90,000.

There was evidence from which the jury could have found the following facts: Robert McConnell, hereinafter "plaintiff," was an employee of Esselbruegge Gas Company, a dealer supplying liquefied petroleum gas (LPG) to owners of refrigerated trucking equipment in the St. Louis area. He was thoroughly experienced in the handling, transportation and delivery of LPG. He had been so employed for 12 years. Appellant operated a truck line. Several of its trailers were refrigerated. Trailer 4513 was equipped with a refrigerating machine known as a Transicold. This unit was powered by a combustion engine fueled by LPG from a 30-gallon tank, which was attached to the trailer. This and similar tanks on other Pic-Walsh refrigerated trailers for several years had been serviced and filled by plaintiff, driver for Esselbruegge Gas Company, from a delivery truck equipped with a large tank, a metering device, a pump and hose with a nozzle so built as to make a sealed connection between supply tank and trailer tank. It was plaintiff's practice to make daily calls at appellant's terminal, during which he would check the refrigerated trailers and fill to 80% of capacity any tanks less than 50% full. (Tanks would not be filled to 100% capacity because LPG gas expands when heated. It is a custom in the industry, for safety purposes, not to fill LPG tanks beyond 80% of capacity.) Ordinarily plaintiff received no instructions as to the manner of performing his work. It was his routine practice, understood between him and appellant, that plaintiff would make sure that all refrigerated trailer tanks were always filled with LPG and that he should fill them "on his own" without specific orders and directions from appellant. It was a standing order to "keep them full." Sometimes, however, when one was empty, appellant would call plaintiff's employer to

be sure that plaintiff would "get it." Otherwise no one at Pic-Walsh would ordinarily direct plaintiff to come out to service the tanks or how to go about the actual filling operation.

On Sunday morning, August 30, 1964, plaintiff's employer received a call from his answering service, telling him that someone from Pic-Walsh had called and stated that the fuel tank on trailer 4513 was empty; that 4513 was in the trailer shop, loaded with beer, and needed to be filled "right away." When plaintiff telephoned his employer that morning, "to see if (he) had any calls," his employer relayed the message, telling plaintiff that there was a refrigerated trailer in the garage at Pic-Walsh; that it was empty and that they wanted it filled. Plaintiff proceeded to appellant's terminal. There he saw Eddie Barsanti, an employee of appellant, who told him that trailer 4513 was empty; that it had "run out of gas and quit running"; that it was "setting there in the shelter in the garage," loaded with beer, and instructed him to fill it "right away." Plaintiff knew Barsanti as an employee of appellant who on occasion had previously given him information as to the condition of the tanks and had previously given him instructions to fill tanks with gas. Plaintiff had relied upon the information given him by Barsanti before that day. Plaintiff drove his delivery truck to the south side of the garage or trailer shop preparatory to servicing trailer 4513. The trailer shop was a large building, 42 x 60 feet in size, in which trailers were serviced by appellant's employees and made ready for the road. It was equipped with six overhead doors, three on the north and three on the south side. There were three skylights in the roof; ventilators in the ceiling. All six of the doors and at least one of the skylights were "wide open" so as to admit air when plaintiff arrived at the trailer shop. When the doors were open there was enough ventilation that drivers had no fear of carbon monoxide inhalation. There was an average wind velocity of 17 m. p. h. that day. There was a washroom on the north end of the building in which a gas water heater was located. Acetylene equipment was kept in the shop and welding was done there. Trailer 4513 was at rest, inside the building, in the first aisle on the west side. Plaintiff had gassed up trucks in this trailer shop more than once; perhaps as many as four times. Plaintiff was familiar with trailer 4513. He had previously serviced it many times. Its tank was equipped with a filler valve, a pressure relief ("pop-off") valve, and a rotary gauge. A rotary gauge is designed to indicate the amount of LPG in the tank. The gauge on 4513 was not working. Plaintiff knew that it was broken. He had known this for at least a month or six weeks prior to August 30, 1964. He had reported this to appellant's director of operations sometime previously. Since the gauge was not operating it was impossible to determine how much gas was in the tank (a sealed unit). Plaintiff would never fill the tank on trailer 4513 ("wouldn't fool with it") unless someone told him that it was empty. On previous occasions when told that it was empty it always had been empty. The motor on the Transicold unit was not running. Plaintiff computed that under existing weather conditions (temperature 80° Fahrenheit and getting warmer) the 30-gallon tank should be charged with 24 liquid gallons (80% of capacity), since he was proceeding on information that it was empty. In fact the tank was partially filled at that time. Plaintiff was unable to stay near the transfer point because it was necessary for him to go to his truck to watch the meter on his truck in order to determine when 24 gallons had been delivered. He let out 150 feet of hose, which he hooked up to the trailer tank. He opened the filler valve on the tank, went back to the delivery truck, and opened the valve by the meter. The pump on the delivery truck was running. He watched the meter until it reached 24 gallons, and then shut it off. At that time he heard a sound like a "boom" or a shotgun discharging. He turned around and saw flames around the fuel tank of the trailer. Various em-

ployees of Pic-Walsh were on the premises at the time. Barsanti, whom plaintiff had seen that morning, was working at the rear of the trailer when the fire started. Plaintiff had seen "a little colored fellow" working around the trailer when he started his operation. He "missed a man that worked around there." Plaintiff grabbed a fire extinguisher and ran 140 feet to the trailer and looked underneath (thinking that the man who checks the tires was there and had been trapped in the fire). When plaintiff stooped down the pressure relief valve "popped off" and sprayed him with raw gas, setting him on fire. There was evidence that the pilot light on the gas heater ignited the propane vapors which escaped from the LPG tank when it overfilled.

### Contributory negligence as a matter of law?

Appellant argues that plaintiff was guilty of contributory negligence as a matter of law; that he was not a novice in the business; was aware of the dangers attending overfilling of a tank; was obliged to exercise a high degree of care commensurate with the deadly and dangerous character of his product; knew that the gauge was broken and that he could not determine the contents of the tank; was in sole charge and control of the equipment and instrumentalities; that plaintiff, alone, overfilled the tank, contrary to an absolute duty imposed upon him by law not to fill the tank beyond a safe level. Appellant cites cases indicating the care to be exercised in handling such a commodity as gas; the duty of investigation and inspection when a situation suggestive of dangers appears, and refers to the rule that "(t)he risk reasonably to be perceived defines the duty to be obeyed." Appellant cites Grissom v. Handley, Mo.App., 410 S.W.2d 681, suggesting that in that case the court "unequivocally spelled out that a liquefied petroleum gas company and its employees have the duty not to fill a tank beyond a safe level."

The pertinent question is whether appellant's assurance that the tank was empty and appellant's direction to fill the tank justified plaintiff in doing what he did. One may not be guilty of contributory negligence in exposing his person to known and appreciated danger where there is some reason of necessity or propriety to justify him in so doing. Fletcher v. Kemp, Mo. Sup., 327 S.W.2d 178, 183. On previous occasions plaintiff had safely relied upon the representations of appellant's employees that the tank was empty. "A person may rely on assurances, or representations of safety made to him by others, where, under the same or similar circumstances, an ordinarily prudent man would do so." 65A C.J.S. Negligence § 118(3), p. 47. Here the representation was that the tank was empty. [In Heldenfels v. Montgomery, Tex.Civ.App., 157 S.W.2d 998, a road contractor assured a machinist, who was given a hollow piston of a water pump to repair, that the piston was solid. Acting in reliance on that assurance the machinist applied heat to it and it exploded. The contractor was held liable as against the contention that the machinist had equal, if not better, means of knowing whether the piston was solid than the contractor.] Because of the broken gauge, plaintiff could not know how much LPG was in the tank. Plaintiff had no means or ability of satisfying himself other than by taking the word of appellant's employee that the tank was empty. A jury could find that plaintiff had a right to rely upon appellant's assurance on this occasion that the tank was empty, and to conclude that filling the tank to 80% of capacity would not result in an overfill but would be a safe procedure. Plaintiff, of course, was not thereby relieved of the duty of exercising care for his own safety. "* * * [O]ne may not rely on assurances of safety where he is aware of the danger or where the danger is so obvious and imminent that an ordinarily prudent person, under the same or similar circumstances, would not do so." 65A C.J.S. Negligence § 118(3), p. 47. The act of metering 24 gallons of LPG into the tank under the circumstances of this case, however, may not be said *as a matter of law*

to have involved an imminent danger so obvious or glaring that no reasonably prudent person exercising the degree of care required of those who handle the dangerous commodity gas would have undertaken to do the work in such a manner. Fletcher v. Kemp, supra, is instructive on this question. See also Spurlock v. Union Finance Co., 363 Mo. 62, 248 S.W.2d 578, and McDonald v. Morrison Plumbing & Sheet Metal Co., 209 Mo.App. 23, 236 S.W. 418.

Appellant further argues that plaintiff is guilty of contributory negligence as a matter of law because he violated Chapter 323, RSMo 1959, V.A.M.S., and the Rules and Regulations for Handling Liquefied Petroleum Gas promulgated thereunder by the Motor Fuel Unit of the Department of Revenue, and § 2407, Revised Code of the City of St. Louis, and the rules and regulations promulgated thereunder, by undertaking to fill the tank inside a building and by failing to remain close to the transfer connection during the filling operation. These rules provide that fuel supply containers shall be charged only in the open air or in buildings especially provided for that purpose; that industrial trucks equipped with permanently mounted fuel containers shall be charged outdoors; and that "At least one attendant shall remain close to the transfer connection from the time the connections are first made until they are finally disconnected during the transfer of product." Plaintiff was shown to have knowledge of these rules and of the danger involved in violating them, and appellant urges that the failure to take the safety precautions thus imposed by statute and ordinance constituted negligence per se.

■ While ordinarily a failure to observe a duty imposed by statute or ordinance makes a prima facie case of negligence, Lochmoeller v. Kiel, Mo.App., 137 S.W.2d 625, 630, in the absence of proof of legal excuse or avoidance,[1] Ruediger v. American

Bus Lines, Inc., Mo.Sup., 426 S.W.2d 4, 9, there is the additional requirement that the violation must be shown to have concurred with the negligence of the defendant and *contributed to the injury as a proximate cause.* 65A C.J.S. Negligence § 127, pp. 88, 89. All reasonable minds would not conclude that the infractions were the proximate cause of the injury in this case and therefore, even if arguendo plaintiff was negligent by reason of infraction of the rules, plaintiff is not, as a matter of law, barred from recovery. "In order for contributory negligence to legally bar the plaintiff's recovery, it is not sufficient that plaintiff was negligent and that such negligence contributed to the cause, or was a contributing cause, of his injury—a contributing cause but for which the injury would not have been sustained. The negligence of plaintiff must have been a proximate cause, that is, a 'proximate cause' as the term is used in expressing a cause which may be reasonably regarded as a direct, producing or efficient cause; or as entering into and forming a part of the direct, producing or efficient cause of the injury. [Citing cases.]" Stumpf v. Panhandle Eastern Pipeline Co., 354 Mo. 208, 189 S.W. 2d 223, 227 [7, 8]. And see Danner v. Weinreich, Mo.Sup., 323 S.W.2d 746, 750 [1]. There was evidence from which a jury could find that these several conditions obtained and events occurred preceding the injury: The tank to be filled was inside a building. The gauge on the tank was not operating. Appellant represented that the tank was empty. The tank was not empty. Plaintiff, during the filling operation, did not remain close to the transfer connection because he could not meter in 24 gallons from that point (he had to be at the meter, which was 140 feet away). An effort was made to inject 24 gallons into a tank which would not take 24 gallons, because it was already partially filled. The tank overflowed and the vapors ignited. Plaintiff decided to attempt to rescue a person or

---

1. Plaintiff urges that the complete ventilation of the trailer shop and the necessity of standing at the meter constitute such

legal excuse or avoidance (a determination not necessary for us to make).

persons he thought were in danger, and ran 140 feet toward the fire. As he arrived at the trailer the heated, volatile liquid expanded and sprayed onto plaintiff, setting him on fire. Plaintiff's acts in undertaking to fill a tank inside a building and in not staying close to the transfer point during the filling operation could reasonably be regarded as conditions obtaining at the beginning of a chain of events leading to a casualty which, although in a sense contributory to the final result, should be excluded as a proximate cause and not considered a direct, producing or efficient cause of the injury. A jury reasonably could have found that if the tank had been empty, as represented, there would have been no overflow and no fire; that there was an efficient, intervening cause following the infraction of the rules and regulations; that the proximate cause of the injury was the overflowing of the LPG from the already-too-full tank, following appellant's representation that the tank was empty. The facts and circumstances do not compel the inference that plaintiff's acts in violation of the rules and regulations were a direct, producing or efficient cause of the injury. If appellant's misrepresentation negligently misled plaintiff, the jury reasonably could have believed that appellant's negligence "was not only *a* direct, producing or efficient cause, but *the* direct, producing or efficient cause of plaintiff's injury, and that the negligence of plaintiff under the circumstances was a cause which should not be reasonably regarded as a direct, producing or efficient cause for which plaintiff should be considered responsible." Stumpf v. Panhandle Eastern Pipeline Co., supra, 189 S.W.2d, 1. c. 228 [10]. (Our emphasis.) In this connection see Bledsoe v. Northside Supply & Development Company, Mo.Sup., 429 S.W.2d 727 (decided by Division Two on July 8, 1968).

The question of causal connection between plaintiff's infraction of the rules and regulations and plaintiff's injury, and the whole question of contributory negligence vel *non*, were properly left to the jury to determine.

### Assumption of risk?

■■■ Appellant argues that plaintiffs are barred under the doctrine of assumption of risk; that plaintiff undertook to fill an LPG container which under his theory, by his admission, and to his knowledge contained defective equipment preventing him from determining the contents, in violation of statutory safety precautions, resulting in overfilling the tank; that whatever risk incident to filling the tank was *as a matter of law* voluntarily assumed, incurred and brought upon himself. We may not declare as a matter of law that plaintiff assumed the risk when he undertook to fill the tank because the evidence does not lead to the single conclusion that the exposure to risk was voluntary. The doctrine of assumed risk " * * * has no application where the *exposure results from facts, circumstances* and surroundings which constitute a real inducement to expose one's self to the danger, as where the injured person surrenders his better judgment as a result of an assurance of safety. [65A C.J.S. Negligence § 174(2), p. 293]." Fletcher v. Kemp, supra, 327 S.W.2d 1. c. 183 [7]. The circumstances were such that reasonable minds might differ as to the voluntariness of plaintiff's exposure to risk. As indicated above, a jury could find that appellant, by his employee Barsanti, in directing plaintiff to fill the tank, gave him an assurance that it was empty and therefore safe for him to proceed to fill in the usual manner. Since reasonable minds could differ on the question it would have been improper for the court to direct a verdict on the ground that plaintiff aassumed the risk.

### Cause of ignition?

■■■ Appellant contends that the evidence was insufficient to establish that the fire was caused by propane gas coming in contact with a lighted water heater. Whether the ignition was due to the water heater or some other agency on appellant's premises would have been of little importance because appellant was not charged with negligently maintaining a lighted water

heater,[2] except for the fact that plaintiff's verdict-directing instruction required a finding that the vapors were ignited by contact with a lighted water heater. Plaintiff, having adopted this theory, had the burden of substantiating it. It is substantiated by admissions made by appellant in the pleadings and in its brief, by the opinion of an expert witness and by circumstantial evidence of the fact. Appellant admitted in its answer that "there were open flames capable of igniting gas during filling operations." Appellant admitted in its brief that it is a matter of common knowledge that LPG is of a combustible nature and that vapors of propane gas coming in contact with a lighted water heater could and would cause a fire. The testimony clearly showed that there was a gas-fired water heater located in the washroom in appellant's trailer shop, and that the fire was caused by ignition of LPG vapor. Barsanti testified to flames shooting the length of the trailer, "shooting all over," and that flames were "going in the washroom." A fire chief who arrived at the scene while the fire was still burning checked the water heater and gave as his opinion that the pilot light on the gas heater could have ignited, and did ignite, the vapors. While he did not testify that he saw a flame he accounted for the absence of a flame by the fact that "assuming there was a concussion," the concussion would automatically put out the flame. That there was a concussion is a reasonable inference from the evidence that there was "a boom"; that the sound made when LPG vaporizes in the atmosphere and is ignited is "like a whoom, concussion sound." Appellant conceded that the ignition of LPG "would naturally make a concussion sound like a 'boom.'" While the circumstantial evidence that the pilot light on the water heater was burning was not strong (there was no testimony that the water tank contained hot water, or that the valve regulating the gas intake on the water heater was found in an open position) it was substantial and with the admissions, expert opinion and other data was sufficient to carry the question of the existence of this supporting fact to the jury.

Appellant counts upon its employee's testimony that the pilot light was not burning, and that the vapors may have been ignited by the operation of the engine on the Transicold unit, which appellant's evidence indicated was running during filling operations, but we are limited to a consideration of the evidence favorable to the prevailing parties and must ignore that favorable to appellant, in determining this issue.

■■■ Appellant attacks the fire chief's testimony, claiming that his opinion testimony was inadmissible as an invasion of the province of the jury. He had 32 years' experience in investigating fires. He had investigated roughly a thousand fires. He was aware of the volatile propensities of gas and the ease with which it can be ignited. He looked for open flames capable of starting a fire if they came in contact with gas. His opinion as to the cause of the ignition was a matter for the consideration of the jury. Appellant's objections to the fire chief's testimony are not well taken, and the court did not err in admitting his testimony. State v. Turnbough, Mo. Sup., 388 S.W.2d 781 [6, 7].

*Rescue doctrine inapplicable?*

■■■ Appellant argues the insufficiency of the evidence to warrant invocation of the rescue doctrine (under which it is held not negligence to knowingly and voluntarily place one's self in a position where he is liable to receive a serious injury when the exposure is for the purpose of saving human life). Appellant contends that plaintiff cannot rely upon the rescue doctrine for several reasons: 1. Because plaintiff's negligence contributed in producing the harm by which the third person

---

**2.** The negligence charged was telling plaintiff that the tank was empty without knowing whether or not it was empty.

came into peril. This was a question for the jury, resolved against appellant. 2. Because appellant's negligence was not the proximate cause of the injury. This likewise was for the jury's determination. 3. Because there was no showing that anyone was in imminent peril, or "exactly who the mythical person was he was attempting to save." Before the fire occurred Curtis Williams, a colored employee of appellant, was "fueling up" tractors with Diesel fuel, working about 25 feet from the building, at a place where he could see plaintiff (and therefore presumably could have been seen by plaintiff). When Williams heard the explosion he ran to the building to see what was going on, and started to enter the middle lane of the north end of the building. Before the fire Barsanti was working on the lights of trailer 4513. He had just started to kneel down to replace a bulb on the right-hand back side of the trailer when the fire broke out. He started to run toward the office. The flame was so intense that he "couldn't get by," so he ran out of the building. Plaintiff testified that he "missed a man that worked around there"; that he had seen an employee of Pic-Walsh "pass through there"; that he thought the man was underneath the truck; that he thought he was checking tires; that "a little colored fellow" who checked tires was around there; that he was at the back end of the truck the last time plaintiff saw him, and that plaintiff supposed that he got trapped in the fire. Plaintiff said "I just had him in mind. I didn't want him to burn up." This was sufficient evidence from which the jury could find that there was someone in peril; that the situation was such as to clearly convince plaintiff that human life or limb was in peril, and that plaintiff "acted from humanity's sake to rescue such person from peril," within the requirements of Eversole v. Wabash R. Co., 249 Mo. 523, 155 S.W. 419, and that plaintiff's conduct was that of an ordinarily prudent man under the circumstances, and not reckless and rash so as to preclude reliance on the rescue doctrine.

## Refusal of Instruction A.

■ Appellant offered and the court refused to give Instruction A, which exonerated appellant on the basis that plaintiff voluntarily entered into the area of the fire knowing that fire at the area of the gas tank created a dangerous condition. There was no error in refusing to give Instruction A. It ignored one of the fundamental bases of plaintiff's theory of recovery, the rescue doctrine, which was submitted in plaintiff's verdict-directing Instructions 3 and 4. Thereby Instruction A circumscribed "the submissible and submitted factual bases for plaintiff's recovery." Phillips v. Vrooman, 361 Mo. 1098, 238 S.W.2d 355, 360 [8]; Journagan v. McElroy, Mo.Sup., 336 S.W.2d 692, 695.

## The duty defendant owed plaintiff?

■ Appellant points out that plaintiff was an employee of an independent contractor; that the work was in charge of the independent contractor; that appellant, the property owner, had no control over the details or manner in which the work should be accomplished, and on this basis contends that the contractor alone is responsible to any person in his employ injured in the course of the work, and that appellant is not liable; that appellant owed plaintiff no duty. Alternatively, appellant argues that at most the duty owed was that due to a bare licensee, since plaintiff did the work in the trailer shop, an unauthorized portion of the premises which plaintiff must be held to have taken in the condition he found there. Plaintiff's evidence, however, clearly showed that appellant positioned trailer 4513 in the trailer shop, called upon plaintiff's employer for a delivery of LPG and upon plaintiff's arrival on appellant's premises instructed plaintiff to fill the tank on trailer 4513 "right away." Plaintiff's status was that of a business invitee, as to whom appellant owed the duty to exercise reasonable care for his safety. Szofran v. Cen-

tury Electric Co., Mo.App., 255 S.W.2d 443, 450.

■ Appellant's Points VII and VIII charge error in the giving of Instructions Nos. 3, 4 and 5. The errors now assigned on appeal were not the subject of definite objections or requests made during the trial in accordance with Civil Rule 79.01, V.A.M.R., nor were these allegations of error presented to the trial court in a motion for new trial. Accordingly, these allegations of error were not preserved for appellate review. Civil Rule 79.03.

### Verdict indicative of bias and prejudice?

■ Appellant makes the point that the verdict in favor of both plaintiffs "was excessive and its excessiveness is evidence of bias and prejudice on the part of the jury, and the trial court erred in failing to sustain defendant's motion for a new trial" [on this ground]. Appellant argues that plaintiff's evidence revealed numerous factors contributing to if not causing plaintiff's inability to work as a truck driver, not related or attributable to the injuries suffered August 30, 1964; points out the medical testimony favorable to appellant, and draws comparisons between the experience and abilities of appellant's and respondents' medical witnesses, but does not seek a remittitur. By attacking the size of the verdict on the sole ground that it is so excessive as to evidence bias and prejudice appellant is claiming that the verdict is the result of misconduct on the part of the jury. Misconduct of this gravity, when found, vitiates a verdict in its entirety, cannot be corrected by remittitur, and requires that the verdict be set aside and a new trial be awarded not only on the question of damages but also on the question of liability. Skadal v. Brown, Mo.Sup., 351 S.W.2d 684 [14]; Nussbaum

v. Kansas City Stock Yards Co. of Maine, Mo.Sup., 359 S.W.2d 335 [4]. The mere size of a verdict, however, is not sufficient in and of itself to establish that the verdict was the result of misconduct, bias or prejudice. There must have been some incident or occurrence at the trial, or error committed, of such a nature as to engender bias, passion or prejudice. Skadal, Nussbaum, supra, and authorities cited. Trial courts may pass on the weight of the evidence in considering the size of the verdict but it is not the function of appellate courts to weigh the evidence in reviewing a jury case. "Certainly it should not do so when [as here] this ground has been presented to the trial court and it has found against this contention." (Our brackets.) Nussbaum, supra, 359 S.W.2d l. c. 341 [6]. Appellant fails to point out any incident or occurrence at the trial to justify a finding of misconduct on the part of the jury, and we have found none. Appellant suggests merely that the "cumulative evidence in this case which required some four days to try" and "the dramatics surrounding the fire" caused the jury to be "carried away," and that the pain endured by plaintiff aroused the natural sympathy of the jury. These are insufficient bases upon which to find misconduct, bias, passion or prejudice.

The judgment is affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

HENLEY, P. J., STORCKMAN, J., and CASEY, Special Judge, concur.

SEILER, J., not sitting.